829 A.2d 976

CIRCUIT CITY STORES, INC.,

v.

**ROCKVILLE PIKE JOINT VENTURE
LIMITED PARTNERSHIP.**

No. 122, Sept.Term, 2002.

Court of Appeals of Maryland.

Aug. 1, 2003.

332

Roger W. Titus (Samantha M. Williams of Venable, Baetjer and Howard, LLP, on brief), Rockville, for petitioner.

Joseph P. Suntum(Maury S. Epner of Miller, Miller & Canby, on brief), Rockville, for respondent.

Argued before BELL, C.J. ELDRIDGE, RAKER, WILNER CATHELL HARRELL BATTAGLIA and JJ.

WILNER, Judge.

This is a dispute between the owner of a shopping center, Rockville Pike Joint Venture Limited Partnership (Rockville), and one of its former tenants, Circuit City Stores, Inc. (Circuit City). The substance of the dispute, litigated in the Circuit Court for Montgomery County, arose from a default by Circuit City on its lease and the subsequent demolition of the leased premises and erection of a larger building, which Rockville found necessary in order to attract a replacement tenant. Rockville won its case in the first round of litigation in 1999 but then had the victory snatched from it two years later through the granting of a motion to vacate or modify the initial judgment. That produced a secondary procedural issue of whether the Circuit Court had any authority to modify the judgment.

The Court of Special Appeals reversed the latter ruling, holding that, even if the Circuit Court had authority to modify

the 1999 judgment, it erred in doing so. We shall conclude that (1) the trial court had no authority to reopen and modify its judgment, (2) it erred substantively in concluding that, as a result of the demolition of the premises, Circuit City had no further obligation under its lease, but (3) Circuit City is entitled to litigate any dispute over the amount of credit to which it may be entitled against that obligation. In order to give effect to that third conclusion, we shall direct that the case be remanded for further proceedings in the Circuit Court.

## BACKGROUND

In July, 1987, the parties entered into a 20–year lease of approximately 28,500 square feet of retail space in the Winter-green Plaza Shopping Center, located on Rockville Pike in Montgomery County. Rockville regarded Circuit City as an "anchor" tenant for the shopping center. Three provisions in the lease are of special relevance:

(1) In Rider 2 to the lease, Circuit City agreed that it would "continuously operate its business at the Demised Premises" throughout the term of the lease, except for customary retail holidays, reasonable periods for taking inventory, and periods not to exceed 60 days in order to accomplish a permitted assignment or subletting.

(2) Paragraph 20 of the lease prohibited Circuit City from assigning the lease or subletting the leased premises without the prior written consent of Rockville, which consent was not to be unreasonably withheld or delayed. The paragraph required Circuit City, with respect to any proposed transfer of all or substantial part of the premises, to submit certain information to Rockville regarding the transfer and gave Rockville specified time periods in which to approve or disap-prove the transfer. If the transfer was approved, Rockville could elect either to release Circuit City from further liability under the lease and receive all of the rend paid by the transferee or to divide equally with Circuit City any rent to be paid by the transferee that was in excess of the rent due by

Circuit City under the lease, until the amount paid to Circuit City reimbursed it for tenant improvements it had made. Subject to those provisions, Circuit City was not relieved of any liability under the lease by reason of an assignment or subletting.

(3) Paragraph 24, captioned "Landlord's Remedies," provided, among other things, that if Circuit City failed to observe any of the material terms and covenants in the lease, failed to cure a default within 30 days after receipt of written notice from Rockville, and, as a result, the covenants to be performed by Circuit City were not being performed, Rockville had the right to terminate the lease and, immediately and without demand or notice, enter the premises, repossess it, and expel Circuit City. The paragraph provided that, notwithstanding any entry by Rockville, whether by termination or otherwise, Circuit City remained liable for and agreed to pay amounts equal to the installments of rent and other charges reserved in the lease, as if the lease had not been terminated, whether or not the premises remained vacant. If the property was re-let by Rockville, Circuit City would be entitled to a credit equal to the net amount of rent received by Rockville, after deduction of all actual and reasonable expenses incurred in the re-letting, including any remodeling costs.

In the summer of 1995, Circuit City decided to relocate its store to a different shopping center. Among the reasons cited for that decision were that the store was too small and that sales were not meeting the company's expectations. Circuit City did not inform Rockville of its decision until January, 1996. Rockville was then in the process of attempting to refinance the center. In September, 1996, it offered to expand the leased premises to 45,000 square feet and asked Circuit City to reconsider its decision, but Circuit City rejected that offer. Circuit City retained a broker to assist in finding a replacement tenant and apparently submitted a number of proposals to Rockville, which found none of them suitable for the space. One of the proposed replacement tenants was MARS, Inc., a retailer of musical instruments, equipment, and accessories.

On October 21, 1997, without having found a replacement tenant acceptable to Rockville and with more than 10 years remaining on the lease, Circuit City closed the store and vacated the premises. Two days later, Rockville declared Circuit City in violation of the continuous operation requirement and therefore in default. In December, 1997, Circuit City again proposed MARS, Inc. as a subtenant, and, indeed, in January, 1998, it entered into a sublease with that company. On February 3, Rockville rejected the sublease, however, explaining that it regarded Circuit City as an anchor tenant and expressing its belief that MARS could not fulfill that role. Rockville noted that Circuit City had a very large customer base, that its store averaged nearly $17 million in annual sales, and that it drew a substantial number of customers to the shopping center. MARS, it said, had a limited customer base and would not attract a large number of customers to the center. Its projected annual sales were only half those of Circuit City and it was not an anchor tenant in any other shopping center. The sublease, moreover, obligated MARS to remain for only six months, and, even though Circuit City would remain liable, Rockville was not willing to risk another vacancy in such a large area of the shopping center. Rockville noted that Mars was a start-up company that was heavily in debt and that the private placement memorandum produced as part of its effort to raise capital warned that its stock was speculative and involved a high degree of risk.

Circuit City responded two weeks later with an action for a declaratory judgment that Rockville's rejection of the MARS sublease was arbitrary, unreasonable, contrary to fair dealing, and thus in violation of the lease and that Circuit City was therefore relieved of any further obligation under the lease. That produced a dual reaction on Rockville's part. On March 31, 1998, it gave formal notice that it was terminating the lease. It declared Circuit City in default by publicly announcing its decision to vacate the property without first having obtained an approved subtenant or assignee, by failing to operate its business continuously throughout the lease term, and by failing to maintain fire insurance. By reason of that

default, Rockville advised that it had reentered and repossessed the premises, that Circuit City had no further authority to enter on or convey any interest in the premises, and that Circuit City remained liable for the payment of amounts equal to the rent and other charges due.

Contemporaneously with that notice, Rockville filed a counterclaim for breach of contract. In addition to seeking damages for the amount of rent due during the remaining term of the lease, Rockville claimed that the breach frustrated its attempt to refinance the shopping center and that further actions by Circuit City had prevented it from finding a replacement tenant. Both parties subsequently amended their initial pleadings, Circuit City to seek damages and Rockville to seek a declaratory judgment.

While the litigation was pending, Rockville found a prospective new tenant—Magruder's Grocery, a subsidiary or affiliate of Richfood Holdings, Inc.—but, prior to signing a lease, Richfood insisted on written confirmation from Circuit City that it had no claim of possessory interest in the property and would not interfere with Magruder's possession and use of the premises. In furtherance of that demand, Rockville requested that Circuit City sign a Consent to Lease, which Circuit City refused to do absent a complete release of liability by Rockville. In response to that refusal, which it treated as impairing its ability to find a new tenant, Rockville filed a motion for partial summary judgment on the issue of liability—that Circuit City breached its lease obligations, that the lease had been terminated, and that Circuit City had no present possessory interest in the property. On August 20, 1998, following a hearing, the court granted that motion, declaring from the bench that Circuit City had vacated the property and that Rockville had the right "to relet the premises free from claims by Circuit City."

To that point, Circuit City had been paying the amount of rent it was obligated to pay under the lease. Beginning in August, 1998, however, it reduced that amount by at least $27,000 per month—the amount that MARS would have been

obliged to pay had the sublease been approved by Rockville—apparently on the theory that the sublease was wrongfully rejected and that Circuit City was entitled to a credit for the amount that Rockville would have received under that sublease.[1]

In June, 1998, the court entered a scheduling order that, among other things, required discovery to be completed by November 30, 1998. Throughout parts of 1998, Rockville apparently had engaged in discussions with another food store, Food Lion, Inc., but, until May, 1999, those discussions were not fruitful. On May 11, 1999, Rockville and Food Lion entered into a 20–year lease for 40,000 + square feet at the location formerly leased to Circuit City. In order to provide the building and certain accessory areas for Food Lion, it was necessary to demolish the existing structure that Circuit City had occupied, along with structures occupied by three other tenants, and to construct a new facility. The lease required Food Lion to do that work at its own expense. The base rent began at $344,000 per annum, increasing incrementally after the fifth, tenth, and fifteenth years of the lease.

Within two days after the signing of the lease, Rockville provided a copy of it to Circuit City which, several weeks later, moved to amend the scheduling order to permit further discovery. Circuit City noted Rockville's contention that Circuit City remained liable for all amounts due under its lease, less credit for sums received from any re-letting of the premises, and urged that, in order to be able to calculate the credit, it was entitled to know what the overall economic benefit of the new lease with Food Lion would be. Circuit City sought, as additional discovery, (1) all documents relating to the Food Lion lease and its negotiation and all documents relating to the additional economic information concerning the shopping center, which Circuit City considered necessary for one of its experts to perform a discounted cash flow comparative analysis, (2) reopening of one deposition for questioning concerning

---

1. A witness for Rockville testified that Circuit City reduced its payment by $35,000 $40,000/month.

the Food Lion lease, and (3) four new depositions concerning that lease. At the hearing on the motion, Circuit City contended that information regarding the negotiations with Food Lion was critical to its being able to show that the rejection of the MARS sublease was pretextual, done in order that Rockville could make a better deal with Food Lion.

After a hearing, the court denied that motion, agreeing with Rockville that information regarding the amount of credit to which Circuit City might be entitled was not relevant to the issues at trial. The court explained that the issue at trial, as to damages, was only those damages accrued as of the date of trial and that the motives with respect to the Food Lion lease "are not relevant."

Two issues were tried and submitted to the jury: (1) whether Rockville proved that Circuit City committed an unexcused or unwaived material breach of the lease provision concerning continuous operation; and (2) whether Circuit City proved that Rockville breached its lease obligations by unreasonably withholding consent to the proposed sublease with MARS. The Food Lion lease was admitted into evidence, and its supposed impact on Rockville's decision not to approve the MARS sublease was argued. In special verdicts, the jury answered the first question in the affirmative and the second in the negative, the effect of which was to establish liability on the part of Circuit City. The parties stipulated that the amount of rent and other charges due and owing under the Circuit City lease through the date of trial was $488,236.

Remaining at issue, with respect to damages, were only prejudgment interest and attorneys' fees. Rider Four to the lease provided for late charges at the rate of 1.5% per month but Circuit City contested the validity of that provision. Paragraph 42 of the lease provided for "reasonable attorneys' fees" for the prevailing party in any litigation to enforce the terms of the lease, and, in the absence of an agreement, it became necessary for the court to determine that amount.

Based upon the jury verdicts and the stipulation, the court, on August 27, 1999, entered a multi-part "Judgment Order."

In the first part of the order, the court found the late fee provision in the lease valid, calculated what a reasonable attorneys' fee would be, and, based on those determinations, entered judgment in favor of Rockville on Count I of its Second Amended Counterclaim in the amount of $488,236, plus $44,262 in pre-judgment interest, $166,346 in attorneys' fees, and court costs. It also ordered Circuit City to pay to Rockville post-judgment interest at the rate of 10% per annum on the unpaid amount of the judgment. Finally, in this first part of the judgment order, the court ordered Circuit City to pay to Rockville, on the days originally fixed in the lease, amounts equal to the installments of rent and other charges reserved in the lease, as if the lease had not been terminated, provided that, if the premises were re-let, Circuit City was entitled to a credit equal to the amount of rent received by Rockville, after deduction for all actual and reasonable expenses incurred in re-letting the premises, including remodeling costs and brokerage fees, together with interest at the rate of 1.5% per month from the date those payments became due.

Pursuant to Rockville's request for a declaratory judgment in its Second Amended Counterclaim and consistently with the jury's verdicts, the court declared that (1) Circuit City breached its lease obligations by vacating the premises in violation of the continuous operation provision; (2) Rockville had not excused or waived the benefit of that provision; (3) Circuit City's breach constituted a material breach of the lease that discharged Rockville from any further duty of performance under the lease; (4) Rockville therefore had no contractual or legal obligation to consent to the proposed MARS sublease presented in December, 1997; (5) Rockville's refusal to consent to that sublease did not constitute a material breach of the lease; (6) Rockville did not unreasonably withhold consent to the sublease; (7) Rockville terminated the lease on March 31, 1998, and Circuit City had no obligation to provide fire insurance after that date; and (8) Circuit City remained liable, pursuant to the lease, to pay amounts equivalent to the installments of rent and other charges reserved in the lease as

if the lease had not been terminated, less a credit equal to the net amount of rent received by Rockville, after deduction for all actual and reasonable expenses incurred in re-letting the premises. In its declaratory judgment, the court stated that it was not attempting to define the term "net amount of rent" and was not precluding the parties from later contesting the meaning of that term. It also stated that, as damages had been awarded under Count I of the Second Amended Counter-claim, it was not necessary to enter a monetary judgment under Count II.

Finally, in furtherance of its determination that Circuit City would be entitled to a credit against its continuing obligation, the court directed that Rockville notify Circuit City and the court when it first commenced to receive rent or other consideration arising from a re-letting of the premises, after which the court would, if necessary, determine the amount of credit to which Circuit City was entitled. Perhaps in the belief that, due to the prospect of a further order being entered with respect to any credits, the judgment order did not finally dispose of all issues, the court made an express determination that there was no just reason for delay and thus entered the judgments set forth in the order as final under Maryland Rule 2–602(b).

No appeal was taken from the judgment order. Circuit City paid, in full, the amount then required of it ($698,846) and received a partial satisfaction of the judgment. It then resumed payment of the monthly amounts that it would have been required to pay under the lease. In February, 2000, Food Lion began demolition of the building in preparation for the construction of its new facility. In September of that year, Circuit City, informed that the Food Lion store was nearing completion and was due to open in November, wrote to Rockville seeking information regarding the rent commencement date and the amount of credit Rockville believed was appropriate. Rockville responded with a letter and attached exhibits showing (1) an amount due under the lease for rent and other costs, through the end of the lease term, of $4,327,547, (2) rent and costs to be collected from Food Lion

during that period of $1,960,120, (3) a net amount of rent and other costs due by Circuit City, after crediting the amounts to be collected from Food Lion, of $2,367,426, (4) $1,889,125 in costs of re-letting, and (5) $17,390 in miscellaneous reimbursable costs.

It is evident that Circuit City did not accept that position, and it informed the court of the need for a "status conference." The court scheduled a hearing for January 19, 2001, presumably to consider what, if any, credits were due to Circuit City against its continuing obligation. The day before that hearing was to occur, however, Circuit City filed a motion to modify or vacate the August, 1997 judgment and to require Rockville to refund all payments made by Circuit City following demolition of the building formerly occupied by Circuit City. The gravamen of the motion was that, upon terminating the lease and reentering the premises, Rockville assumed a duty to mitigate its damages, notwithstanding the "survival" clause in the lease, that, when it caused or allowed the demised premises to be demolished, it acted for its own benefit, rather than that of Circuit City, and thereby effected a surrender of the lease, and that the effect of the surrender was to excuse Circuit City from all further obligation under the lease. Alternatively, Circuit City averred that demolition of the building and cancellation of three adjoining leases made it impossible to calculate damages. In a subsequent memorandum, Circuit City also contended that the judgment should be set aside under Maryland Rule 2–535(b) for fraud. The fraud, it claimed, arose from Rockville's failure to produce in discovery certain documents that, in Circuit City's view, indicated that Rockville's rejection of the MARS sublease was, indeed, pretextual.

Rockville contested the motion on two grounds: one, that the court had no authority to modify or vacate an enrolled judgment on the grounds asserted; and two, that there was no merit to the motion in any event. The court rejected those defenses and granted the relief requested by Circuit City. In an order entered July 2, 2001, the court, citing the part of its 1999 judgment directing Rockville to notify Circuit City and

the court when it first began to receive rent and positing the prospect of a further hearing to determine the amount of net credit to which Circuit City may be entitled, found that it did have the authority to modify or vacate the judgment. On the merits, the court concluded that a tenant's obligation to pay rent or damages for vacating the premises ceases when the landlord substantially alters the demised premises, even where a survival clause exists. Accordingly, it found that, when Rockville allowed Food Lion to demolish the building previously occupied by Circuit City, Rockville accepted a surrender of the lease, and that Circuit City was excused from making any payments thereafter. It granted Circuit City's motion and ordered Rockville to refund all payments made by Circuit City after February, 2000—the date the demised premises were demolished.

Rockville appealed, arguing that (1) the 1999 judgment acted as *res judicata* as to all defenses that could have been raised at trial and that it could not be vacated based on a new defense theory asserted 17 months later, (2) the 1999 judgment could not be vacated under the guise of exercising a limited retained jurisdiction to calculate a credit due to the judgment debtor for payments made by a third party, and (3) the court erred by applying a principle of landlord-tenant law to strike an enrolled judgment awarding contract damages.

The Court of Special Appeals found merit in the third argument and, as a result, never addressed the authority of the trial court to vacate or modify the initial judgment. The intermediate appellate court concluded that the parties had a dual relationship—a landlord-tenant relationship founded on property law and a contractual relationship governed by contract law. It held that, although a surrender of the lease terminates the leasehold estate and the obligations associated with that estate under principles of property law, the survival clause, obligating Circuit City to continue payment of amounts that otherwise would have been due as rent during the full lease term, is enforceable under contract law, notwithstanding the termination of the leasehold estate. The court also concluded that, although the amount of credit to which Circuit

City is entitled by reason of payments to Rockville under the Food Lion lease may be difficult to determine if credit is due for any of the money expended by Food Lion for construction of the building, that was not a reason to terminate the obligation. Because, in its view, the Circuit Court erred in concluding otherwise and, as a result of its erroneous ruling, in terminating Circuit City's continuing obligation, the appellate court found it unnecessary to determine whether the 1999 judgment was even subject to modification.

## DISCUSSION

### Introduction

Three issues are raised by the parties: (1) whether the 1999 judgment was final; (2) if so, whether it was subject to being reopened and modified on the ground of fraud; and (3) if the judgment was subject to being reopened, whether the trial court erred in determining that demolition of the building, by effecting a surrender of the lease, terminated Circuit City's obligation for further payment of rent damages. We shall conclude that the 1999 judgment *was* final, that there was no fraud on Rockville's part that would justify a reopening of that judgment, and that the trial court therefore erred in considering, in the context of a motion to vacate or modify that judgment, whether demolition of the building terminated Circuit City's contractual obligation to pay rent damages.

That does not end the matter, however. It is clear under the lease that Circuit City is entitled to credit against its continuing obligation for amounts received by Rockville pursuant to its lease with Food Lion, and, to the extent there is a dispute as to the amount of credit to which Circuit City is entitled, that Circuit City is entitled to a judicial determination of that dispute. Although the 1999 judgment may not be reopened, and there is no reason to reopen it, Circuit City is not precluded from seeking post-judgment relief in the Circuit Court to resolve the dispute over the amount of credit to which it is entitled.

Because it is clear that there is such a dispute, we shall, pursuant to Maryland Rule 8–604(d), remand that aspect of the case for further proceedings and, for the guidance of the court on remand, shall make clear our view that, although demolition of the building by Food Lion, pursuant to its lease, did not serve to terminate Circuit City's obligation to continue payment of rent damages, the court, in determining the proper credit to be applied against that obligation, must consider the full net economic benefit to Rockville from the Food Lion lease, in accordance with Paragraph 24 of the Rockville–Circuit City lease.

### *Nature and Modifiability of 1999 Judgment*

Rockville's first complaint about what the Circuit Court did in 2001 is that the court had no authority to modify the 1999 judgment. That judgment, according to Rockville, was final when entered. It became enrolled thirty days later, in default of any appeal or timely motion to revise it, and, in the absence of fraud, mistake, or irregularity, which Rockville denies exists, the court had no jurisdiction thereafter to modify it.

Circuit City, of course, has a different view. It claims (1) that the 1999 judgment was not final and thus never became enrolled, and (2) that, even if the judgment *was* final, it was procured by fraud and therefore was subject to reopening under Maryland Rule 2–535(b). In support of its first claim, Circuit City treats this case as having been bifurcated for trial, with the first phase involving the issues of (1) whether Circuit City breached the lease by vacating the premises and failing to maintain fire insurance, (2) whether Rockville breached the lease by arbitrarily and wrongfully refusing to approve the MARS sublease, and (3) if those issues were decided in Rockville's favor, what damages were due to Rockville through the date of trial. If that first phase resulted in liability on Circuit City's part under the survival clause for the continued payment of rent damages, the second phase would determine the amount of credit to be applied to that continuing obligation. The fact that the judgment order entered by the Circuit Court in 1999 expressly reserved jurisdiction to

resolve any dispute over such credits establishes, in Circuit City's view, that the 1999 judgment was not final but was interlocutory in nature.

The claim of fraud arises from Circuit City's assertion that Rockville wrongfully failed to disclose, in response to discovery, certain documents that, in Circuit City's view, established that Rockville's refusal to approve the MARS sublease was pretextual, which was a critical issue in the first proceeding. Circuit City charges that the deliberate non-disclosure of those documents constituted extrinsic fraud, which is a ground for reopening an enrolled judgment, that, if the non-disclosure did not constitute extrinsic fraud, it constituted intrinsic fraud, and that this Court should abandon its long-held view that intrinsic fraud is not a basis to reopen an enrolled judgment.

The requisite of finality for a judgment has multiple significance.[2] If not final, either intrinsically or pursuant to a direction under Maryland Rule 2–602(b), the ruling is ordinarily not appealable, will not be indexed, does not become a lien on land, does not carry post-judgment interest, and remains subject to revision by the court until a final judgment is entered. If final, it is subject to a motion to revise and to appeal, but the time limits for those avenues of relief begin to

---

2. To some extent, there is at least an ambiguity, if not a near-contradiction, in our jurisprudence regarding the notion of a "final judgment." We often use that term or discourse on whether a particular "judgment" is "final," and both the Maryland Rules and the Maryland Code also either use the term "final judgment" or speak to when a "judgment" is "final." *See* Md. Rule 2–602(a)(1); Md.Code, § 12–301 of the Courts & Judicial Proceedings Article. Yet Maryland Rule 1–202(n) defines the word "judgment" as an order of court "final in its nature," suggesting that if the order is not final, it is not a judgment at all; the adjective merges with the noun. Under that notion, there is no such thing as a non-final judgment. The definitional Rule is useful in its application, but, in a logical sense, it often begs the question. The issue, in most instances, is whether the order or ruling in dispute has the attribute of finality necessary for it to be given effect in the desired context—appealability, enforceability, preclusive effect, imperviousness to revision. Whether, giving heed to Rule 1–202(n), we view the question in terms of whether the order or ruling is actually a judgment or speak instead of whether it is a final judgment is substantively irrelevant.

run from the date of entry. If final, it may not be revised by the court except in accordance with Rules 2–533, 2–534, and 2–535.

Neither the Code nor the Rules define when an order or ruling is sufficiently final to qualify as a judgment, perhaps wisely, as it is sometimes a very perplexing problem. The Supreme Court has observed that "whether a ruling is 'final' . . . is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality," and, in light of that difficulty, that Court concluded that "the requirement of finality is to be given a 'practical rather than a technical construction.' " *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199, 203 (1964) (quoting in part *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528, 1536 (1949)). We have expressed similar comments. *See Brewster v. Woodhaven Building*, 360 Md. 602, 623, 759 A.2d 738, 749 (2000) ("The bar has had more difficulty determining finality and appealability than with perhaps any other issue"); *see also* Carleton M. Crick, *The Final Judgment as a Basis for Appeal*, 41 YALE L.J. 539, 540 (1932).

We have established the general criteria for finality by case law. In *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989), we held:

> "If a ruling of the court is to constitute a final judgment, it must have at least three attributes: (1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601." [3]

---

**3.** Since *Rohrbeck* was decided, one additional requirement has been added. Maryland Rule 2–601(a) requires that the judgment be set forth in a separate document.

*See also Board of Liquor v. Fells Point Café,* 344 Md. 120, 129, 685 A.2d 772, 776 (1996); *Jones v. Hubbard,* 356 Md. 513, 524, 740 A.2d 1004, 1010 (1999).

Whether the first two of those conditions are met usually will depend on what is before the court for adjudication. Although a number of sub-issues were presented, five basic legal or factual issues were before the court in the 1999 proceeding—two dealing with liability and three with damages. The liability issues, submitted to and resolved by the jury, were: (1) did Circuit City breach the lease by vacating the premises or by not maintaining the fire insurance; and (2) if so, did Rockville breach the lease by wrongfully withholding consent to the MARS sublease. In light of the jury's verdicts on those issues, the court was required to determine what relief Rockville was entitled to receive. As noted, the parties had agreed that, if the first two issues were decided in favor of Rockville, Circuit City would remain liable under the lease to continue paying, as damages, the amount of rent and other costs reserved in the lease until the expiration of the lease term, subject to credit for amounts received by Rockville from any re-letting of the premises. The parties also agreed on the amount of that obligation through the date of trial. That left two further issues—the amount of pre-judgment interest and the amount of a reasonable attorneys' fee.

All five of those issues were not only resolved, but were incorporated into the court's judgment order, both in terms of the amount of money declared to be due to Rockville, which was entered, recorded, and indexed as a judgment, and in the context of the declaratory judgment entered by the court. The court's judgment order disposed of every issue then in controversy—all claims against all parties—and it is clear from both the court's invocation of Maryland Rule 2–602(b) which, as we shall explain, was unnecessary, and from its express determination that the amount declared due was to carry immediate post-judgment interest, that the court intended the rulings entered on those issues to be immediately enforceable, to be immediately appealable, and thus to be final.

The question of credits against Circuit City's continuing obligation, which later triggered the controversy now before us, was not then in contention and could not have been resolved by the trial court. In accordance with the dual requests for declaratory judgment and in conformance with the jury's verdict, the court declared that Circuit City remained liable for the amount of rent that it otherwise would have to pay had the lease continued. There was no qualification to that declaration, even though the parties and the court were aware that the demised premises were to be demolished by Food Lion. The effect of the Food Lion lease was relevant only with respect to the amount of credit to which Circuit City might become entitled in the future.

The invocation of Maryland Rule 2–602(b) and the express reservation of jurisdiction to consider any disputes over credits against Circuit City's continuing obligation apparently proceeded from the assumption that disputes might arise with respect to those credits. The prospect of such a dispute does not affect the finality of the rulings entered, however, and did not warrant action under Rule 2–602(b). Indeed, if a controversy over credits was then properly before the court, the entry of judgment under Rule 2–602(b) would have been inappropriate, as that controversy would have been part of the continuing obligation claim made by Rockville, and we have made clear that a ruling disposing of only part of a claim may not be entered as a judgment under Rule 2–602(b). *See Biro v. Schombert,* 285 Md. 290, 402 A.2d 71 (1979); *East v. Gilchrist,* 293 Md. 453, 445 A.2d 343 (1982); *Medical Mutual v. Evander,* 331 Md. 301, 628 A.2d 170 (1993).

The problem here lies in the trial court's having treated a dispute over post-judgment credits as denigrating the force, effect, and finality of the judgment itself. Judgments often do not end the litigation. It is not uncommon, for example, for a Circuit Court, in reviewing a decision of the District Court or of an administrative agency, to remand the matter for further proceedings. The decision resolves the issues presented to the Circuit Court and completes the disposition of all that is then before that court, but it does not determine the ultimate

disposition of the matter in controversy, which may well come back before the court in a subsequent proceeding. Yet we have consistently held that such an order constitutes a final judgment. *See Ferrell v. Benson,* 352 Md. 2, 720 A.2d 583 (1998); *Carroll v. Housing Opportunities Comm'n,* 306 Md. 515, 510 A.2d 540 (1986); *Montgomery County v. Revere,* 341 Md. 366, 671 A.2d 1 (1996).

Also in point is *Jones v. Hubbard, supra,* 356 Md. 513, 740 A.2d 1004. There, the court entered a consent judgment for $5,000, with a proviso that it could be settled upon payment of $2,550 within 30 days. The thirtieth day fell on a Saturday, and the $2,550 was paid the following Monday. When the plaintiff refused to mark the judgment satisfied, the defendant sought injunctive relief and also to amend or revise the judgment. We held that the judgment was final under the *Rohrbeck* criteria, even though it left open a future event. We concluded that, because the discount provision was part of the judgment, Maryland Rule 1–203(a), which deals with the computation of time and provides that, if the last day of a period falls on a Saturday, Sunday, or holiday, that day is not counted and that the period extends to the next day that is not a Saturday, Sunday, or holiday, was applicable, and that the payment was therefore timely under the judgment.

Other courts have recognized judgments as final, notwithstanding that they not only leave open but indeed anticipate that further proceedings will be required in order to implement the judgment. In *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), an antitrust action, the District Court found that the merger in question violated the Clayton Act and ordered divestiture. The order did not specify a particular plan for divestiture, however, but "reserve[d] such a ruling pending the filing of suggested plans for implementing divestiture." *Id.* at 305, 82 S.Ct. at 1513, 8 L.Ed.2d at 524. Notwithstanding that loose end, the Supreme Court held that the order was sufficiently final to allow an appeal. The Court observed that the order "disposed of the entire complaint filed by the Government," that "[f]ull divestiture ... was expressly required," and that the defendant was

permanently enjoined from having any future interest in the other company. *Id.* at 308, 82 S.Ct. at 1514, 8 L.Ed.2d at 525–26. *See also Trujillo v. Hilton of Santa Fe,* 115 N.M. 397, 851 P.2d 1064 (1993); *Thompson v. Hodge,* 348 S.W.2d 11 (Mo.Ct. App.1961).

Both the Maryland Rules and the law generally contemplate a range of post-judgment disputes that may come before the court for resolution. Although perhaps more frequent in equity matters, where some continuing supervision by the court may be necessary and further orders are expected, disputes over the interpretation and enforcement of money judgments are not uncommon. Apart from proceedings simply to enforce the judgment (discovery in aid of enforcement, attachments and garnishments of property, sequestration of property, provided for in Maryland Rules 2–633, 2–642 through 2–644, 2–645 and 2–646, and 2–648), proceedings may arise from disputes over set-offs, agreements to settle a judgment (*see Miller v. Havre de Grace B. & T. Co.,* 186 Md. 678, 48 A.2d 433 (1946)), or whether a judgment has been satisfied. In those kinds of proceedings, the court may enter orders that not only alter or determine the debtor's obligation under the judgment but, in some instances, affect the judgment itself, yet the prospect of such orders, or even the contemplation of them, does not destroy the finality of the judgment upon which they are based.

■ It is clear to us that the judgment entered in August, 1999 was final when entered, that it became enrolled 30 days later, and that it was not subject to modification thereafter except in accordance with Maryland Rule 2–535(b), for fraud, mistake, or irregularity. As an alternative argument in support of the court's modification of the judgment, Circuit City urges that there was, indeed, fraud, emanating from Rockville's refusal to disclose two letters written during its negotiations with Food Lion. Circuit City now contends that Rockville's failure to produce those "relevant and discoverable documents" prevented Circuit City from introducing them to support its case in the 1999 trial.

The Circuit Court did not find any fraud and did not base its reopening of the judgment on fraud, and, as we have indicated, there was no fraud. The issue of whether documents pertaining to Rockville's negotiations with Food Lion were discoverable was raised in Circuit City's June, 1999 motion to reopen discovery. Circuit City sought "all documents relating to the Food Lion lease, including the negotiation thereof," asserting that discovery of those documents was "essential to the prosecution of Circuit City's case and to the defense of the counter-claim brought by [Rockville]." The court denied that motion, however, finding that those documents were not relevant to any issue to be resolved at the August, 1999 trial. Once judgment was entered against it, Circuit City chose not to appeal the court's ruling on its discovery motion, as it could have done. The effect of the ruling was that the documents were not discoverable and were not relevant. Withholding them could not, therefore, be regarded even as violative of discovery, much less as fraudulent. There was, accordingly, no authority for the trial court to reopen and modify the August, 1999 judgment.

### Termination of Circuit City's Continuing Obligation

Although Circuit City, by filing a motion to modify or vacate the 1999 judgment, invoked an inappropriate procedure to present its claim that demolition of the demised premises terminated its obligation under that judgment, and the court erred in entertaining such a motion, Circuit City is entitled, under both the lease and the 1999 judgment, to credit against its continuing obligation for "the net amount of rent received by [Rockville], after deduction for all actual and reasonable expenses incurred in re-letting the Demised Premises ... and in collecting the rent in connection therewith." To the extent there is a dispute as to the amount of such credit, as clearly there is, Circuit City is entitled to a judicial resolution of that dispute, and, to that end, and in the interest of judicial economy, we shall direct that the case be remanded to the Circuit Court for appropriate further proceedings.

The key issue presented by Circuit City is whether, by allowing Food Lion to demolish the demised premises, Rockville somehow forfeited or waived its right to continued rent damages from Circuit City. The Court of Special Appeals addressed and ruled upon that issue, and, for the guidance of the Circuit Court, we shall do likewise. *See* Md. Rule 8–604(d).

At common law, a landlord had three options when a tenant abandoned a commercial lease prior to its expiration. One was to accept a surrender of the lease and thereby terminate the tenancy. The RESTATEMENT (SECOND) OF PROPERTY § 12.1 notes that an abandonment of the premises may be treated as an offer by the tenant to surrender the lease, which the landlord may accept by reentering the premises for the landlord's own benefit. If the landlord, expressly or by its conduct, accepts the implied offer and effects a surrender, the tenancy is terminated and the tenant's obligation to pay further rent is also terminated. The landlord may, as a second option, reenter the premises for the account of the tenant, attempt to re-let the property for the tenant's benefit, and hold the tenant liable for any rent that had accrued at the time of the reentry as well as any future deficiency if the premises were unable to be re-let or were re-let at a lower rent than was reserved under the lease. Finally, under the traditional common law rule, the landlord could do nothing and hold the tenant liable for the entire amount of rent payable during the remaining term of the lease. *See Wilson v. Ruhl,* 277 Md. 607, 610, 356 A.2d 544, 546 (1976); *see also* 3 HERBERT THORNDIKE TIFFANY THE LAW OF REAL PROPERTY § 902 (3d ed.1939 and 2002 Supp.).

In 1974, the Legislature, by statute, effectively abrogated that third option with respect to residential leases by requiring residential landlords to mitigate damages that result from a tenant's termination of occupancy before the end of the term. *See* Maryland Code, § 8–207 of the Real Property Article. More contemporary common law has sought to achieve the same result with respect to commercial leases. Friedman notes that:

"under the modern rule landlord may not remain idle when the tenant abandons the premises without legal excuse for so doing. He must make an effort to mitigate his damages as a condition of recovery against the tenant, in this case by endeavoring to relet."

2 Milton R. Friedman, Friedman on Leases § 16.3, at 1084 (4th ed.1997) and cases cited there. *Compare* Restatement (Second) of Property § 12.1 cmt. *i*, at 391–92 (1977), reciting the more traditional rule: "A tenant who abandons leased property is not entitled to insist on action by the landlord to mitigate the damages, absent an agreement otherwise."

It is not necessary for us to resolve that issue in this case because it is clear that, in response to Circuit City's abandonment, Rockville did, indeed, accept a surrender of the lease. On March 31, 1998, it informed Circuit City that it was "terminating the Lease effective immediately," that Rockville had "re-entered and repossessed the Demised Premises effective this date," and that Circuit City had "no right or authority to enter upon or attempt to convey any interest in the Demised Premises." That action, supplemented in August, 1998, by its successful quest for a partial summary judgment confirming that the lease had been terminated and that Circuit City had no possessory interest in the premises, clearly effected a surrender of the lease and a termination of the tenancy. It therefore chose the first of the three options and not the third.

▪ ■ When there is a surrender of the lease, the landlord becomes free of the tenancy and may again deal with the property unfettered by it. On the other hand, because a surrender terminates the tenancy, the tenant's obligation to pay rent ceases. To gain the advantage of a surrender but avoid that consequence, landlords began to insert in leases provisions similar to that contained in paragraph 24 of the lease here, making the tenant liable for the amounts of rent reserved in the lease, notwithstanding any entry or termination by the landlord upon the tenant's default, and to rely on contract law, rather than property law, for the enforcement of

that obligation. That, in turn, rests on the proposition, that we have embraced, that a lease is both a contract and a conveyance of a leasehold estate in land, that, as such, it creates between the parties both privity of contract and privity of estate, and that, as a result, "the obligations which the parties bear to each other may arise out of contract or from the real covenants of the leasehold estate, or sometimes from both." *Arthur Treacher's v. Chillum Ter.*, 272 Md. 720, 727, 327 A.2d 282, 286 (1974).

The inclusion of such a provision often shifts the focus away from whether a completed surrender occurred, because, even if it did, the tenant may remain liable for the amount of rent reserved in the lease as a matter of contract law. The difference is that the claim is not for the post-surrender rent itself which, under property law, is no longer owed, but for damages arising from breach of the contract. *See Zazanis v. Gold Coast Mall*, 63 Md.App. 364, 370, 492 A.2d 953, 956 (1985) and cases cited there; *see also Hermitage Co. v. Levine*, 248 N.Y. 333, 162 N.E. 97 (1928) ("[once] the lease was at an end ... [w]hat survived was a liability, not for rent, but for damages"); *Hart v. Vermont Inv. Ltd. Partnership*, 667 A.2d 578 (D.C.1995); *N.J. Ind. Properties v. Y.C. & V.L., Inc.*, 100 N.J. 432, 495 A.2d 1320 (1985); *P.S.G. Ltd. v. August Income/Growth Fund*, 115 N.M. 579, 855 P.2d 1043 (1993); *Winshall v. Ampco Auto Parks, Inc.*, 417 F.Supp. 334 (E.D.Mich.1976).

In either case, whether seeking to recover rent under property covenants on the theory that a surrender has not occurred or to recover contract damages under contract law, the landlord has its own obligation to mitigate damages. We have recognized generally that, when one party breaches a contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defaulting party only with such damages as, "with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent." *Sergeant Co.*

*v. Pickett*, 285 Md. 186, 203, 401 A.2d 651, 660 (1979). That principle applies as well to damages resulting from a tenant's abandonment of leased premises. *See* FRIEDMAN, *supra* § 16.303, at 1115–16:

> "It has already been noted that when a tenant walks out during the term the landlord generally need not relet under the traditional common law rule. This is a rule of property law. If the lease has been terminated and the claim is for damages, the law of contracts becomes applicable. From now on the landlord must endeavor to relet and minimize his damages, that is, as a condition precedent to recovery against the original tenant."

Circuit City avers that, when a landlord, following a surrender, takes action "inconsistent with the notion of a reletting at the expense of the former tenant, but instead entirely demolishes the former premises ... the protection of a survival clause is waived." On that premise, it argues that the issue is no longer one of credits but of an *ipso facto* extinguishment of any liability under paragraph 24 of the lease. That is not correct, and the cases cited by Circuit City do not support its position.[4] In *Wilson v. Ruhl, supra,* 277 Md. at 610–11, 356

---

4. Circuit City relies heavily on *P.S.G. Ltd. v. August Income/Growth Fund, supra,* 115 N.M. 579, 855 P.2d 1043. The lease in question contained a continuing obligation clause that required the tenant to pay, as liquidated damages, the amount of monthly rent specified in the lease, but also required the landlord to use its best effort to mitigate all damages and to re-let the premises in the event of a default by the tenant. The lease was subordinate to a mortgage on the premises, upon which the landlord defaulted. The mortgage was foreclosed and the property sold. That, said the court, precluded the landlord from performing its obligation to re-let the premises and mitigate damages; and thus limited its right to the liquidated damages. The obvious distinction between that case and this one is that demolition of the building as part of the Food Lion lease has, in no way, precluded Rockville from mitigating damages. Rockville acknowledges that Circuit City is entitled to credit for net amounts received from Food Lion. The only issue is how to calculate those credits. In *Mesilla Valley Mall v. Crown Industries*, 111 N.M. 663, 808 P.2d 633 (1991), the tenant defaulted, the landlord resumed possession, and, instead of attempting to mitigate damages, it allowed a museum to occupy the property rent-free. The court regarded that as accepting a surrender of the lease and, as there was apparently no provision for continued payments following

A.2d at 546–47, we concluded that the duty of a landlord to mitigate its damages upon a default by the tenant requires only that the landlord "exercise reasonable diligence in an effort to obtain a new tenant," and that, when there is a dispute over the matter, "[i]t is normally left to the trier of facts to determine whether the landlord's efforts to relet satisfied his duty to mitigate."

On remand, the court will need, first, to examine the efforts made by Rockville to find a new tenant, in light of Circuit City's conduct, and determine whether the arrangement with Food Lion was reasonable. If the court determines that Rockville's efforts and the arrangement with Food Lion were not reasonable, it may, on that basis, conclude that Rockville breached its contractual obligation to mitigate damages and that, from and after the time of that breach, it was entitled to no further payments from Circuit City. If the court concludes that Rockville did exercise reasonable diligence and that, in the circumstances, the arrangement with Food Lion was reasonable, it will then have to determine, from that arrangement, "the net amount of rent received by Landlord, after deduction for all actual and reasonable expenses incurred in re-letting the Demised Premises. . . ."

Circuit City makes an additional argument in its brief that, by substantially altering the demised premises, Rockville has made it impossible to calculate its damages, thereby relieving Circuit City from any continuing liability. It relies, for that proposition, on *Marco Kona Warehouse v. Sharmilo, Inc.*, 7 Haw.App. 383, 768 P.2d 247 (1989). That case is inapposite.

---

a surrender, held that the obligation for rent ceased upon the termination. The court acted solely on the basis of property law. That situation prevailed as well in some of the other cases cited by Circuit City. *See Michigan Lafayette Building Co. v. Continental Bank*, 261 Mich. 256, 246 N.W. 53 (1933); *Meeker v. Spalsbury*, 66 N.J.L. 60, 48 A. 1026 (1901). One case cited by Circuit City—*Northern Indiana Steel Supply Company v. Chrisman*, 139 Ind.App. 27, 204 N.E.2d 668 (1965)—was modified on this very point by a subsequent decision not cited by Circuit City, *Nylen v. Park Doral Apartments*, 535 N.E.2d 178, 181–82 (Ind.Ct.App.1989).

In *Marco*, the defendant leased three bays in a 12–bay warehouse. When it abandoned those bays, the landlord re-let them to another tenant in the same warehouse. The bays vacated by that tenant were then re-let to a third tenant from the warehouse. In its action for damages against the defendant, the landlord sought recovery for lost rent on the bays vacated by the second tenant in order to fill the vacancy left by the defendant. The Hawaii court held that the defendant was not liable for those other "vacanc[ies] of space which it neither leased nor consented to be liable for." *Id.* at 252. *Marco* is neither binding nor applicable here. Rockville has not sought damages for vacancies that Food Lion may have left in moving to the Circuit City location.

In calculating the amount of credit to which Circuit City may be entitled, the court will need to examine a number of things, among which are: (1) the amount of rent received from Food Lion; (2) whether, and to what extent, that amount should be modified by the fact that the area of the leased premises is greater than that rented by Circuit City—whether, in other words, there should be some apportionment; (3) what, if any, net benefit accrued to Rockville from the improvements made by Food Lion or from other provisions in the Food Lion lease; and (4) what effect, if any, should be given to the termination of the other three leases. These determinations may require some expert accounting or economic evidence, but they do not strike us as being impossible to make. *See Dodson v. Anne Arundel County*, 294 Md. 490, 494–95, 451 A.2d 317, 320 (1982) ("The jury may properly consider various elements that influence market value at the time of the taking in its determination of damages ... [including] improvements on the land."); *J.L. Matthews, Inc. v. Maryland–Nat'l Capital Park & Planning Comm'n*, 368 Md. 71, 107–09, 792 A.2d 288, 309–10 (2002) (holding that, in determining a compensation award for a governmental taking, the petitioner was entitled to present evidence of the fair market value of his property, including the value of improvements that he would have made had he not been prohibited from doing so by an injunction).

JUDGMENT OF COURT OF SPECIAL APPEALS RE-VERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-CUIT COURT FOR MONTGOMERY COUNTY AND RE-MAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPIN-ION. COSTS IN THIS COURT AND COURT OF SPE-CIAL APPEALS TO BE PAID BY PETITIONER, CIR-CUIT CITY.