<u>Amber Ben-Davies v. Blibaum & Associates, P.A.; Bryione K. Moore v. Blibaum & Associates, P.A.</u>, Misc. No. 4, September Term, 2017

**POST-JUDGMENT INTEREST RATE – MD. CODE ANN., CTS. & JUD. PROC. (1974, 2013 REPL. VOL.) § 11-107(a), (b) – MONEY JUDGMENT FOR RENT OF RESIDENTIAL PREMISES –** Court of Appeals held that, where landlord sues tenant for breach of contract based on residential lease, and trial court enters judgment in landlord's favor against tenant and judgment includes damages for unpaid rent and other expenses, post-judgment interest rate of 6% applies pursuant to Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) § 11-107(b).

United States District Court
for the District of Maryland
Nos. 1:16-cv-02783-JFM, 1:16-cv-03546-JFM

Argued: December 4, 2017

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 4

September Term, 2017

_____

AMBER BEN-DAVIES
v.
BLIBAUM & ASSOCIATES, P.A.;

BRYIONE K. MOORE
v.
BLIBAUM & ASSOCIATES, P.A.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.

_____

Filed: January 19, 2018

After a trial court enters judgment in a plaintiff's favor against a defendant, the plaintiff is entitled to post-judgment interest until the defendant satisfies the judgment. See Med. Mut. Liab. Ins. Soc'y of Md. v. Davis, 389 Md. 95, 109, 883 A.2d 158, 166 (2005) ("Post-judgment interest begins to run on a money judgment from the date of the entry of that judgment. . . . Post-judgment interest continues to accrue until the judgment is satisfied by payment." (Citations omitted)). The purpose of post-judgment interest is "to compensate the successful [plaintiff] for the [] loss of the use of the monies [that are] represented by a judgment in [the plaintiff's] favor, and the loss of income thereon, between the time of entry of the judgment . . . and the satisfaction of the judgment by payment." Id. at 109, 883 A.2d at 166 (citations and internal quotation marks omitted).

Under Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) ("CJ") § 11-107, different post-judgment interest rates apply to different types of judgments. Generally, under CJ § 11-107(a), except as provided otherwise, a post-judgment interest rate of 10% applies to all judgments. Meanwhile, under CJ § 11-107(b), a post-judgment interest rate of 6% applies to "money judgment[s] for rent of residential premises[.]"

This opinion consolidates two cases that require us to determine which of these two post-judgment interest rates applies where: a landlord sues a tenant for breach of contract based on a residential lease; the trial court enters judgment in the landlord's favor against the tenant; the judgment includes unpaid rent and other expenses; and the judgment does not delineate what portion thereof was comprised of unpaid rent, as opposed to the other expenses—such as late fees or the cost of repairs to the premises.

In separate matters, Amber Ben-Davies and Bryione K. Moore (together,

"Appellants") failed to pay rent. After Appellants vacated their apartments, their respective landlords initiated separate actions for breach of contract. The District Court of Maryland, sitting in Baltimore County ("the District Court"), entered judgments in the landlords' favor against Appellants. The judgments did not delineate the portions thereof that were comprised of unpaid rent, as opposed to other expenses. Ben-Davies's landlord had sought the cost of replacing carpet in her apartment, and Moore's landlord had sought the costs of utilities, changing the apartment's lock, trash disposal, cleaning stained carpet, advertising, and various fees.

Samuel Blibaum ("Samuel") and Gary S. Blibaum ("Gary") of Blibaum & Associates, P.A. ("Appellee"), a licensed debt collector, represented the landlords in the actions for breach of contract. After the District Court entered the judgments, Appellee engaged in collections activity on the landlords' behalf.

On Appellee's behalf, Gary sent Ben-Davies a letter in which he stated that she owed her landlord a certain amount. Appellee obtained a writ of garnishment of Moore's wages, and sent her a Judgment Creditor's Monthly Report. In both the letter that was sent to Ben-Davies, and the Judgment Creditor's Monthly Report that was sent to Moore, Appellee indicated that the applicable post-judgment interest rate was 10%. In other words, Appellee sought to apply the post-judgment interest rate of 10% under CJ § 11-107(a), which applies to all judgments unless provided otherwise.

In the United States District Court for the District of Maryland ("the U.S. District Court"), Appellants filed separate complaints against Appellee. In the complaints, Appellants contended that, contrary to Appellee's position, the applicable post-judgment

interest rate was 6%, not 10%. In other words, Appellants argued that CJ § 11-107(b) applied because the judgments against them constituted "money judgment[s] for rent of residential premises[.]" Appellants asserted that, by seeking to apply a post-judgment interest rate of 10%, Appellee violated the federal Fair Debt Collection Practices Act, the Maryland Consumer Debt Collection Act, and the Maryland Consumer Protection Act.

Ultimately, in each case, the parties filed a "Joint Motion to Certify a Question of Law to the Maryland Court of Appeals," requesting that the U.S. District Court certify the following question of law to this Court:[1]

> Is the legal rate of post-judgment interest on a judgment awarded in a breach of contract action where the underlying contract is a residential lease ten percent (10%)[,] as stated in [CJ] § 11-107(a)[,] or is it six percent (6%)[,] as stated in [CJ] § 11-107(b), which states that it is applicable to "a money judgment for rent of residential premises," where the judgment in the breach of contract action does not specifically delineate what portion, if any, of the judgment was awarded for unpaid rent?

In the joint motions to certify, the parties noted that this was an issue of first impression. The U.S. District Court granted the joint motions to certify.

Before this Court, as in the U.S. District Court, Appellants contend that the applicable post-judgment interest rate is 6% pursuant to CJ § 11-107(b). Appellee responds that the applicable post-judgment interest rate is 10% pursuant to CJ § 11-107(a).

We conclude that, where a landlord sues a tenant for breach of contract based on a residential lease, and the trial court enters judgment in the landlord's favor against the

---

[1]Under CJ § 12-603, this Court "may answer a question of law certified to it by a court of the United States . . . , if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State."

tenant and the judgment includes damages for unpaid rent and other expenses, a post-judgment interest rate of 6% applies pursuant to CJ § 11-107(b). CJ § 11-107(b) unequivocally states that it applies to "a money judgment for rent of residential premises[.]" As such, CJ § 11-107(b)'s plain language establishes that it applies where, as here, a judgment is comprised of unpaid rent and other expenses that are due as a result of a residential lease. Nothing in CJ § 11-107(b) renders it exclusively applicable to money judgments that are entirely comprised of unpaid rent. Stated otherwise, nothing in CJ § 11-107(b) indicates that, for a post-judgment interest rate of 6% to apply, a judgment must consist solely of unpaid rent, and may not include expenses that are associated with the rent of residential premises. Additionally, nothing in CJ § 11-107(b) indicates that it does not apply to actions for breach of contract between landlords and tenants. In addition to the plain language of CJ § 11-107(b), our holding is supported by CJ § 11-107(b)'s obvious purpose, which is to protect tenants by not subjecting them to a 10% post-judgment interest rate on money judgments for rent of residential premises.

## BACKGROUND[2]

### Amber Ben-Davies v. Blibaum & Assocs., P.A.

On August 2, 2005, Ben-Davies signed a lease for an apartment at Stratford Apartments at 1210 East Northern Parkway in Baltimore City. The lease named

---

[2]Typically, "[w]here another court certifies a question of law to this Court, this Court accepts the statement of facts in the certification order." Fangman v. Genuine Title, LLC, 447 Md. 681, 685 n.1, 136 A.3d 772, 774 n.1 (2016) (citation and internal quotation marks omitted). Here, however, the Certification Order lacks a statement of facts. As such, we derive the following facts from the record.

- 4 -

Hendersen-Webb, Inc. ("Hendersen-Webb") as the agent for the apartment building's owner. The period of the lease was from September 12, 2005 through September 30, 2006. The lease would automatically be renewed unless Ben-Davies or Hendersen-Webb provided notice, at least three months in advance, of an intent not to renew the lease. The rent was initially $635.00 a month. Ben-Davies paid a security deposit of $635.00.

Eventually, Ben-Davies vacated the apartment.[3] In a letter dated January 11, 2007, Hendersen-Webb's Supervisor of Collections advised Ben-Davies that she owed $2,728.09. Specifically, according to the Supervisor of Collections, Ben-Davies owed: an overdue balance[4] of $893.62 as of October 9, 2006;[5] $615.55 for the remainder of rent in October 2006; $658.00 for rent in November 2006; $445.83 for rent from December 1, 2006 through December 21, 2006, the day before Henderson-Webb leased the apartment to a new tenant; and $115.09 for replacing carpet in the apartment. Ben-Davies did not make any payments toward the $2,728.09 that Hendersen-Webb alleged was due.

On May 7, 2007, in the District Court, Hendersen-Webb sued Ben-Davies, initiating Henderson-Webb, Inc. v. Amber Ben-Davies, No. 080400171172007 (Dist. Ct. Md.). The complaint named Samuel as Hendersen-Webb's counsel. Hendersen-Webb used the

---

[3]The record does not reveal the date on which Ben-Davies vacated the apartment.

[4]It is unclear how much, if any, of the overdue balance was comprised of unpaid rent.

[5]In the January 11, 2007 letter, the Supervisor of Collections stated: "Please refer to our letter [of] November 9, 2006, which state[d that] the balance due as of that date was $893.62." It is evident that "November" was intended to read "October," given that, elsewhere in the January 11, 2007 letter, the Supervisor of Collections stated that, in addition to the overdue balance, Ben-Davies owed the "balance of October [2006] rent," plus a full month's worth of rent in November 2006.

District Court's form for complaints in civil cases. The form included the following language: "Clerk: Please docket this case as an action of □ contract □ tort □ replevin □ detinue[.]" All of these checkboxes are blank; however, the checkbox that is next to the word "contract" has two typed "Xs" near it.[6] Under the heading "APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT[,]" the complaint stated, in pertinent part: "Attached hereto are [] documents [that] contain sufficient detail as to liability and damage to apprise [Ben-Davies] clearly of the claim against" her.[7] In the complaint, Hendersen-Webb alleged that Ben-Davies "ow[ed] rent and [] caused additional expenses[,] which total $3[,]372.62." Hendersen-Webb sought $2,728.09 in damages, which represented the $3,372.62 in charges minus $644.53—which, in turn, represented Ben-Davies's $635.00 security deposit, plus $9.53 in interest. Hendersen-Webb also sought $76.50 in pre-judgment interest, $409.21 in attorney's fees, and court costs.

On July 19, 2007, the District Court entered judgment on affidavit in Hendersen-Webb's favor against Ben-Davies in the amount of $2,728.09, plus $76.50 in pre-judgment interest, $409.21 in attorney's fees, and $50.00 in court costs. The District Court ordered

---

[6]In the complaint, in multiple instances, two typed "Xs" appear just slightly below, and a short distance to the left of, a blank checkbox. In the joint motion to certify, Ben-Davies and Appellee stated that Hendersen-Webb "filed its [c]omplaint [using] the District Court['s f]orm [] for a breach of contract." Accordingly, it is apparent that two typed "Xs" were intended to appear in the checkbox that is next to the word "contract[.]"

[7]Maryland Rule 3-306(b) states:

In an action for money damages[,] a plaintiff may file a demand for judgment on affidavit at the time of filing the complaint commencing the action. The complaint shall be supported by an affidavit showing that the plaintiff is entitled to judgment as a matter of law in the amount claimed.

that there would be post-judgment interest at the legal rate. The judgment did not delineate what portion thereof was comprised of unpaid rent, as opposed to other expenses—*e.g.*, the cost of replacing carpet in the apartment.

After the District Court entered judgment, Appellee engaged in collections activity on Hendersen-Webb's behalf. Ben-Davies did not make any payments toward the judgment.

On July 19, 2016—nine years after the District Court entered judgment—on Appellee's behalf, Gary sent Ben-Davies a letter in which he stated that the judgment's balance was $5,811.32.[8] This figure was based on a post-judgment interest rate of 10%. Ben-Davies's counsel telephoned Gary, who confirmed that Appellee was seeking to apply a post-judgment interest rate of 10%. During a communication with Ben-Davies's counsel, Appellee offered to settle the judgment's balance for $3,500.00.

On August 5, 2016, in the U.S. District Court, Ben-Davies filed a Complaint and Demand for Jury Trial against Appellee, initiating Amber Ben-Davies v. Blibaum & Assocs., P.A., No. 1:16-cv-02783-JFM (D. Md.). In the complaint, Ben-Davies contended that, contrary to Appellee's position, the applicable post-judgment interest rate was 6%, not 10%. Ben-Davies argued that, accordingly, the judgment's balance was $4,918.92, not $5,811.32. Ben-Davies asserted that, by demanding a higher amount than was due,

_____

[8]In the Complaint and Demand for Jury Trial that Ben-Davies filed against Appellee in the U.S. District Court, and in a Memorandum in Opposition to a Motion to Dismiss, Ben-Davies alleged that, in his July 19, 2016 letter, Gary stated that the judgment's balance was $5,811.32. According to the joint motion to certify, in the July 19, 2016 letter, Gary stated that the judgment's balance was $5,911.32. In any event, the exact amount to which Gary referred is immaterial to the certified question of law.

Appellee violated the federal Fair Debt Collection Practices Act, the Maryland Consumer Debt Collection Act, and the Maryland Consumer Protection Act. Ben-Davies alleged that, as a result of Appellee's actions, she "suffered from emotional distress, stress, anger[,] and frustration."

On September 12, 2016, Appellee filed a Motion to Dismiss and a memorandum of law in support thereof, contending that the U.S. District Court lacked subject-matter jurisdiction because Ben-Davies lacked standing. For purposes of claims under federal law, to have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) (citations omitted). In a Memorandum dated October 11, 2016, the U.S. District Court determined that Ben-Davies lacked standing, and dismissed the complaint. The U.S. District Court reasoned:

> [Ben-Davies]'s conclusory allegation that she has suffered harm is not supported by her allegation that [Appellee] applied the incorrect rate of [post-judgment] interest, particularly in light of the fact[s] that she never paid a cent on the [judgment,] and that [Appellee] offered to settle [the judgment's balance] for less than [the amount that Ben-Davies] alleges was due.

On October 12, 2016, Ben-Davies filed a notice of appeal. In an unreported *per curiam* opinion dated June 1, 2017, the United States Court of Appeals for the Fourth Circuit ("the Fourth Circuit") vacated the U.S. District Court's judgment and remanded for further proceedings. See Ben-Davies v. Blibaum & Assocs., P.A., 695 F. Appx. 674, 677 (4th Cir. 2017) (per curiam). The Fourth Circuit held that Ben-Davies had established injury in fact, explaining:

Ben-Davies alleged that she was a consumer, that [Appellee] acted as a debt collector, and that [Appellee] attempted to collect from her a debt arising out of a state court judgment by demanding payment of an incorrect sum based on the calculation of a[ post-judgment] interest rate [that was] not authorized by law. This was not a case where the plaintiff simply alleged "a bare procedural violation [of the Fair Debt Collection Practices Act], divorced from any concrete harm." *Spokeo*[], 136 S.Ct. at 1549. Indeed, Ben-Davies[] alleged that, as a "direct consequence" of [Appellee's] alleged violations of the [Fair Debt Collection Practices Act]'s proscribed practices, she "suffered and continues to suffer" actually existing intangible harms that affect her personally: "emotional distress, anger, and frustration."

Id. at 676.[9]

### Bryione K. Moore v. Blibaum & Assocs., P.A.

On December 2, 2008, Moore and Keona Pompey signed a lease for an apartment at Tuscany Gardens Apartments at 6 Fallridge Court in Windsor Mill, Maryland. The lease named Peak Management LLC ("Peak Management") as the agent for the apartment building's owner.[10] The period of the lease was from January 1, 2009 through December 31, 2009. The lease would automatically be renewed unless Moore, Pompey, or Peak Management provided notice, at least ninety days in advance, of an intent not to renew the lease. The rent was $895.00 a month. Moore and Pompey paid a security deposit of

---

[9]The Fourth Circuit also noted that Appellee had not disputed that Ben-Davies had established the two elements of standing other than injury in fact—traceability to Appellee's challenged conduct, and likelihood of redress by a favorable judicial decision. See Ben-Davies, 695 F. Appx. at 677.

[10]In a letter dated June 24, 2016 and addressed "[t]o whom it may concern," Moore denied that she had signed the lease, stating: "Apparently[,] someone used my information to get an apartment[,] and I am the victim of some type of fraud." Consistently, in an Amended Complaint and Demand for Jury Trial against Appellee, Moore alleged that, in June 2016, she telephoned Appellee and stated that she had never signed a lease for an apartment that was managed by Peak Management. On brief in this Court, however, Moore does not contend that she did not sign the lease.

$895.00.

On July 30, 2009, Moore and Pompey vacated the apartment. In an invoice dated August 20, 2009, Peak Management indicated that Moore and Pompey owed $3,756.47, which represented $4,664.90 in charges minus $908.43—which constituted Moore's and Pompey's $895.00 security deposit, plus $13.43 in interest. According to the invoice, the $4,664.90 in charges were comprised of: $894.00 for rent in June 2009; $895.00 for rent in each month from July 2009 through September 2009;[11] a $44.75 late fee for each month from June 2009 through August 2009; two $19.75 "filing" fees for June 1 and July 1; two $45.75 "filing" fees for June 2 and July 2;[12] $252.00 for utilities from July 30, 2009 through September 30, 2009; $50.00 for changing the apartment's lock because Moore and Pompey did not return the keys; $146.65 for removing, and disposing of, six bags of trash; $120.00 for cleaning stained carpet; and $252.00 for advertising the apartment. According to a Collection Request dated September 2, 2009, in February and June 2009, Moore and/or Pompey made a total of $150.00 in payments, thus lowering the balance to $3,606.47.

On March 23, 2012, in the District Court, Peak Management sued Moore and Pompey, initiating Peak Mgmt., LLC v. Bryione Kia Moore, No. 080400083952012 (Dist. Ct. Md.). The complaint named Appellee as Peak Management's counsel. Peak Management used the District Court's form for complaints in civil cases. The form included the following language: "Clerk: Please docket this case as an action of □ contract

---

[11]It is unclear why Peak Management sought $894.00 for rent in June 2009, while seeking $895.00 for rent in every other relevant month.
[12]The basis of the "filing" fees is unclear.

□ tort □ replevin □ detinue □ bad faith insurance claim[.]" A typed "X" appears in the checkbox that is next to the word "contract[.]" Under the heading "APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT[,]" the complaint stated, in pertinent part: "Attached hereto are [] documents [that] contain sufficient detail as to liability and damage to apprise [Moore and Pompey] clearly of the claim against" them. In the complaint, Peak Management sought $3,606.47 in damages, $597.96 in pre-judgment interest, $540.97 in attorney's fees, and court costs.[13]

On March 4, 2013, the District Court entered judgment on affidavit in Peak Management's favor against Moore in the amount of $3,606.47, plus $989.01 in pre-judgment interest, $540.09 in attorney's fees, and $123.00 in court costs. The District Court ordered that there would be post-judgment interest at the legal rate. The judgment did not delineate what portion thereof was comprised of unpaid rent, as opposed to other expenses—*i.e.,* the costs of utilities, changing the apartment's lock, trash disposal, cleaning stained carpet, advertising, and fees.

After the District Court entered judgment, Appellee engaged in collections activity on Peak Management's behalf. Moore did not make any payments toward the judgment.

On June 14, 2016—more than three years after the District Court entered judgment—on Peak Management's behalf, Appellee obtained a writ of garnishment of Moore's wages in the amount of $200.00 per pay period. On June 23, 2016, the writ of garnishment was served on Moore's employer. In a letter dated June 24, 2016, Moore

---

[13]On June 11, 2012, the District Court entered judgment in Peak's Management favor against Pompey. On August 11, 2015, Pompey filed for bankruptcy.

requested that Peak Management stop garnishing her wages, and institute a payment plan instead. In a letter dated June 27, 2016, Gary notified Moore's employer that Peak Management had agreed to reduce the garnishment's amount to $75.00 per pay period. Peak Management also agreed to stop charging post-judgment interest as of that date, provided that Appellee continued to receive wage garnishments.

In a Judgment Creditor's Monthly Report dated September 1, 2016, Appellee reported a $150.00 payment occurring on August 5, 2016. In the Judgment Creditor's Monthly Report, Appellee indicated that it was applying a post-judgment interest rate of 10%, and that a total of $6,302.46 would be due at the end of the report period. In the Judgment Creditor's Monthly Report, Appellee indicated that $663.99 in post-judgment interest had accrued as of August 2016.[14]

On October 25, 2016, in the U.S. District Court, Moore filed a Complaint and Demand for Jury Trial against Appellee, initiating Bryione K. Moore v. Blibaum & Assocs., P.A., No. 1:16-cv-03546-JFM (D. Md.). In the Complaint, Moore contended that, contrary to Appellee's position, the applicable post-judgment interest rate was 6%, rather

---

[14]In a Judgment Creditor's Monthly Report dated November 1, 2016—which, ostensibly, was intended to be dated October 1, 2016—Appellee reported a $225.00 payment on September 16, 2016. In another Judgment Creditor's Monthly Report dated November 1, 2016, Appellee reported a $150.00 payment on October 18, 2016. In both of the Judgment Creditor's Monthly Reports dated November 1, 2016, either "0" or "0.00" is typed in the blank spaces for both the post-judgment interest rate and the post-judgment interest that had accrued in September 2016 and October 2016. The opening balance of the first Judgment Creditor's Monthly Report dated November 1, 2016, however, is approximately the same amount as the final balance of the Judgment Creditor's Monthly Report dated September 1, 2016—in which, in turn, Appellee had applied a post-judgment interest rate of 10% to calculate that $663.99 in post-judgment interest had accrued as of August 2016.

than 10%. Moore asserted that, by garnishing her wages to satisfy a balance that was inflated due to the application of a post-judgment interest rate of 10%, Appellee violated the federal Fair Debt Collection Practices Act, the Maryland Consumer Debt Collection Act, and the Maryland Consumer Protection Act. Moore alleged that, as a result of Appellee's actions, she "suffered from emotional distress, stress, anger[,] and frustration."

On November 23, 2016, Appellee filed a Motion to Dismiss and a memorandum of law in support, contending that the U.S. District Court lacked subject-matter jurisdiction because Moore lacked standing.[15] In a Memorandum dated February 2, 2017, the U.S. District Court determined that Moore lacked standing, and dismissed the complaint. See Moore v. Blibaum & Assocs., P.A., No. 1:16-cv-03546-JFM, 2017 WL 462508, at *1 (D. Md. Feb. 2, 2017). The U.S. District Court reasoned:

> [Moore] has failed to state any injury in fact. [Moore] does allege that she suffered emotional harm by the garnishment [that was] lodged against her. However, [Moore] does not contest the judgment that was entered against her, and she admits that [Appellee] agreed to reduce the amount of the payments [that were] to be made pursuant to the garnishment. [Moore] also contends that she was not appropriately credited with any payments [that were] made by [Pompey,] her co-defendant[ in the action for breach of contract in the District Court]. However, [Pompey] filed for bankruptcy, and the schedules [that were] filed in the bankruptcy proceeding indicate[] that any payments [that were] made by [Pompey] were less than the amount of the interest [that was] owed.

---

[15]On December 6, 2016, Moore filed an Amended Complaint and Demand for Jury Trial, which, for the most part, was substantially similar to the Complaint and Demand for Jury Trial. Notably, the amended complaint included a section that was headed "ARTICLE III STANDING[,]" and omitted the count for the alleged violation of the Maryland Consumer Protection Act. On December 23, 2016, Appellee filed a reply in which it stated that the amended complaint rendered the motion to dismiss moot. Also on that date, Appellee filed a Motion to Dismiss the Amended Complaint and a memorandum of law in support. On December 29, 2016, the U.S. District Court issued an order in which it concluded that the first motion to dismiss was moot.

Id.

On February 2, 2017, Moore filed a notice of appeal. In an unreported *per curiam* opinion dated July 19, 2017, the Fourth Circuit vacated the U.S. District Court's judgment. See Moore v. Blibaum & Assocs., P.A., 693 F. Appx. 205, 206 (4th Cir. 2017) (per curiam). The Fourth Circuit held that Moore had established injury in fact, explaining:

> Moore alleged that she was a consumer, that [Appellee] acted as a debt collector, and that [Appellee] attempted to collect from her a debt arising out of a state court judgment by demanding payment of an inflated sum [that was] based on an improper interest rate. This was not a case where the plaintiff simply alleged "a bare procedural violation [of the Fair Debt Collection Practices Act], divorced from any concrete harm." *Spokeo*[], 136 S.Ct. at 1549. Indeed, Moore alleged [] that[,] as a consequence of [Appellee]'s alleged violations of the [Fair Debt Collection Practices Act]'s proscribed practices, she "suffered and continues to suffer" from "emotional distress, anger, and frustration."

Id.[16]

### Joint Motions to Certify

On July 26, 2017, in Ben-Davies, Ben-Davies and Appellee filed a "Joint Motion to Certify a Question of Law to the Maryland Court of Appeals." On the same date, in Moore, Moore and Appellee filed a motion with the same title. In the joint motions to certify, the parties asked the U.S. District Court to certify to this Court the above question of law regarding the applicable post-judgment interest rate.

On August 1, 2017, in Ben-Davies and Moore, the U.S. District Court issued a

---

[16]As in Ben-Davies, 695 F. Appx. at 677, the Fourth Circuit noted that Appellee had not disputed that Moore had established the two elements of standing other than injury in fact—traceability to Appellee's challenged conduct, and likelihood of redress by a favorable judicial decision. See Moore, 693 F. Appx. at 206.

Certification Order in which it granted the joint motions to certify, certified the above question of law to this Court, and stayed Ben-Davies and Moore in that Court pending this Court's ruling. On August 3, 2017, the U.S. District Court issued an Amended Certification Order, which was identical to the Certification Order, except that the U.S. District Court added that, for purposes of the certification, Ben-Davies and Moore were to be considered the Appellants.

## DISCUSSION

### The Parties' Contentions

Appellants contend that, in the instant cases, the applicable post-judgment interest rate is 6% pursuant to CJ § 11-107(b) because the judgments constitute "money judgment[s] for rent of residential premises[.]" Appellants argue that the plain meaning of CJ § 11-107(b) is unambiguous, and CJ § 11-107(b) applies wherever any portion of a judgment consists of unpaid rent that is due under a residential lease. Appellants assert that nothing in CJ § 11-107(b)'s plain language indicates that CJ § 11-107(b) applies solely to actions in which a landlord seeks possession of the premises for failure to pay rent, as opposed to actions for breach of contract. Appellants contend that labeling an action as one for "breach of contract" is of no legal consequence to the applicable post-judgment interest rate, and does not change the circumstance that the judgment is comprised of unpaid rent that is due under a residential lease.

Appellants observe that, in 1980, the General Assembly increased the default post-judgment interest rate from 6% to 10%. Appellants argue that the General Assembly clearly intended to protect tenants in residential leases by not applying a 10% post-

- 15 -

judgment interest rate for money judgments for rent of residential premises.  Appellants assert that, because House Bill 1683—through which the General Assembly enacted CJ § 11-107's predecessor—did not originally include the word "money," but was later amended to insert the word "money" immediately before the phrase "judgment for rent of residential premises[,]" this circumstance reinforces the conclusion that CJ § 11-107(b) applies to any action in which a landlord seeks money damages for rent of residential premises, not just actions in which landlords also seek possession of the premises.[17]

Appellee responds that the plain language of CJ § 11-107(b) demonstrates that it does not apply to judgments in actions for breach of contract, even if the damages include rental payments under a lease.  According to Appellee, under its commonly accepted definition, the word "rent" does not apply to money damages in an action for breach of contract.  Appellee contends that, as used in CJ § 11-107(b), the word "rent" means a payment that is made as part of an obligation that is coupled with an interest in land, and that is extinguished when a tenancy ends.  Appellee argues that, accordingly, under CJ § 11-107(b), the word "rent" arguably includes only unpaid rent for the period when a tenant occupies the premises, and does not include unpaid rent for the period after the tenant vacates the premises.  Appellee asserts that the word "rent" also excludes other components of the judgments in the instant cases—namely, late fees, utilities, and the costs of making repairs to the apartments, changing the locks, and advertising the properties.  Appellee

---

[17]In an amicus brief in support of Appellants, Civil Justice, Inc., the Maryland Volunteer Lawyers Service, and the Public Justice Center contend that CJ § 11-107(b) applies to any judgment that is related to the rental of residential premises.

maintains that these components of the judgments are based solely on obligations under the leases, and thus are comprised of damages for breach of contract, not unpaid rent.

Appellee contends that CJ § 11-107(b) applies only in actions in which landlords seek possession of the premises—such as summary ejectment actions—because, in such an action, the tenant continues to occupy the premises, and thus remains obligated to pay rent. Appellee contends that there is no logical reason to apply a post-judgment interest rate of 6% to actions for breach of contract based on residential leases, while applying a post-judgment interest rate of 10% to actions for breach of contract based on other agreements. Appellee argues that nothing in CJ § 11-107(b)'s legislative history suggests that the General Assembly intended CJ § 11-107(b) to apply to a judgment obtained in an action for breach of contract.[18]

**Standard of Review**

In Bottini v. Dep't of Fin., 450 Md. 177, 187-89, 147 A.3d 371, 378 (2016), this Court explained the rules of statutory construction as follows:

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly.
>
> As this Court has explained, to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute

---

[18]In an amicus brief in support of Appellee, the Maryland Multi-Housing Association, Inc. contends that CJ § 11-107(b) applies only to summary ejectment actions.

to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and the purpose of the enactment under consideration. We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

If the true legislative intent cannot be readily determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

In construing a statute, we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

In addition, the meaning of the plainest language is controlled by the context in which is appears. As this Court has stated, because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

(Citation omitted).

## Post-Judgment Interest Rates

"The right of a [plaintiff] to interest on a judgment did not exist at common law."

Mayor & City Council of Balt. v. Kelso Corp., 294 Md. 267, 275, 449 A.2d 406, 410 (1982)

(citation omitted). That said, "[t]he allowance of interest on a judgment . . . is of ancient

- 18 -

lineage[.]" Md. State Highway Admin. v. Kim, 353 Md. 313, 321, 726 A.2d 238, 242 (1999). For more than 150 years, Article 3, Section 57 of the Constitution of Maryland of 1867 has permitted post-judgment interest, stating: "The legal rate of interest shall be *six per cent per annum*, unless otherwise provided by the General Assembly." See Md. State Archives, Archives of Md. Online Vol. 74 (Proceedings and Debates of the 1867 Constitutional Convention), Vol. 1, at 563, available at http://msa.maryland.gov/ megafile/msa/speccol/sc2900/sc2908/000001/000074/html/am74d--563.html [https:// perma.cc/CF72-EWAZ]; http://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/ 000001/000074/pdf/am74d--563.pdf [https://perma.cc/EE8Z-7BQJ] (italics in original).

In 1980, as permitted by Article 3, Section 57 of the Constitution of Maryland of 1867, the General Assembly enacted Md. Code Ann., Cts. & Jud. Proc. (1974, 1980 Repl. Vol.) ("CJ (1980)") § 11-107, which provided for different post-judgment interest rates, depending on the cause of action. See 1980 Md. Laws 2784-85 (Vol. III, Ch. 798, H.B. 1683). Specifically, CJ (1980) § 11-107 stated, in its entirety:

> (a) Except as provided in § 11-106 of this Article, the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment.
>
> (b) The legal rate of interest on a money judgment for rent of residential premises shall be at the rate of 6 percent per annum on the amount of the judgment.

Id. at 2785. CJ (1980) § 11-107(a) and (b) were substantively identical to their current counterparts. Today, CJ § 11-107 states, in its entirety:

- 19 -

(a) Except as provided in § 11-106 of this subtitle,[19] the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment.

(b) The legal rate of interest on a money judgment for rent of residential premises shall be at the rate of 6 percent per annum on the amount of the judgment.

(c) The legal rate of interest on a money judgment for delinquent real or personal property taxes shall be the greater of:

(1) The sum of the rates fixed under §§ 14-603 and 14-702 of the Tax-Property Article for interest and penalties; or

(2) At the rate of 10 percent per annum.[20]

By enacting CJ (1980) § 11-107(a), the General Assembly increased the default post-judgment interest rate from 6% to 10%. The General Assembly did so because "the old rate no longer fairly compensated [plaintiff]s." Kelso, 294 Md. at 273, 449 A.2d at 409. Additionally, the increase in the default post-judgment interest rate from 6% to 10% reduced defendants' "incentive" to "delay in satisfying their judgments because they [we]re receiving a higher rate of return on the monies than they w[ould] pay in post[-]judgment interest[.]" Id. at 274, 449 A.2d at 409.

Although this Court explained CJ (1980) § 11-107(a)'s purpose in Kelso, this Court has never explained CJ (1980) § 11-107(b)'s purpose. In other words, this Court has never addressed why the General Assembly retained the existing post-judgment interest rate of

---

[19]CJ § 11-106 governs the post-judgment interest rate in an action for breach of contract based on a loan agreement. The parties agree that CJ § 11-106 does not apply to the instant cases.
[20]CJ § 11-107(c), and the tax-related statutes to which it refers, are immaterial to the instant cases.

6% for "money judgment[s] for rent of residential premises[.]"  CJ (1980) § 11-107(b).

We now explore CJ (1980) § 11-107's legislative history.

The stated purpose of House Bill 1683—through which the General Assembly created CJ (1980) § 11-107—was to "provid[e] that the legal rate of interest on certain money judgments shall be at a certain rate."  1980 Md. Laws 2784 (Vol. III, Ch. 798, H.B. 1683).  Through House Bill 1683, in addition to enacting CJ (1980) § 11-107, the General Assembly amended Md. Code Ann., Cts. & Jud. Proc. (1974, 1979 Supp.) ("CJ (1979)") § 11-301(a) as follows:

> In an action for bodily injury arising from the operation of a motor vehicle in which a money judgment is entered in favor of the plaintiff, the court may assess interest against the defendant at a rate of [6] <u>not more than</u> 10[21] percent per annum on the amount of judgment from a time not earlier than the time the action was filed if it finds that the defendant caused unnecessary delay in having the action ready or set for trial.

1980 Md. Laws 2784 (Vol. III, Ch. 798, H.B. 1683) (first set of brackets and underlining in original) (some capitalization omitted).[22]

House Bill 1683's Fiscal Note included the following under "Summary of Legislation": "In actions for automobile liability claims where the court finds that the

---

[21]Before 1980, the General Assembly last amended the statute in 1974.  <u>See</u> 1974 Md. Laws 2857 (Ch. 864, S.B. 1056).  Both before and after the 1974 amendment, "10" did not appear in the statute.  <u>See id.</u>  It follows that the General Assembly added the "10" in 1980, despite the circumstance that the "10" is not underlined in the Session Laws of 1980.  <u>See</u> 1980 Md. Laws 2784 (Vol. III, Ch. 798, H.B. 1683).

[22]In 1980, the General Assembly also passed Senate Bill 184, which would have amended CJ (1979) § 11-301(a) in a manner that was identical to House Bill 1683's, except that Senate Bill 184 would have omitted the phrase "not more than."  <u>See</u> 1980 Md. Laws 2390 (Vol. III, Ch. 698, S.B. 184).  Ultimately, consistent with House Bill 1683, the phrase "not more than" was included, and that phrase remains in CJ § 11-301(a) today.

defendant has caused unnecessary delay in having the action ready for trial, this bill raises the rate of interest on judgment, from 6% to 10%, which the court may assess against the defendant." In other words, House Bill 1683's Fiscal Note summarized only the amendment to CJ (1979) § 11-301(a), not the enactment of CJ (1980) § 11-107.

House Bill 1683's bill file includes a page of a document that is entitled "Insurance News Digest." The page includes the heading "1978 OPERATING RESULTS [/] *Aetna Life & Casualty*[.]" The page contains ten paragraphs, the following two of which are underlined:

> Total premium income for the year was $7.8 billion, and investment income was $1.7 billion. In the property/casualty division, revenues were up 15% to $3.5 billion. Premium income grew 17% in commercial insurance lines and 10% in personal lines. Both areas reported higher operating earnings due mainly to gains in investment income, which increased 10% to $277 million.

(Paragraph break omitted). House Bill 1683's bill file also includes a page of a document that is entitled "Recent Insurance Companies' Results. Best's Insurance [] Reports." The first three words of the following sentence, which appears under the heading "*Crum & Forster*[,]" are underlined: "Net investment income gained 38.5% to $111.7 million." The following two sentences, which appear under the heading "*Travelers Corp.*[,]" are underlined: "Investment income for the first nine months was $978 million, up 18%. On [one indiscernible word] tax basis, the increase was 22%."

House Bill 1683's bill file includes a list of the post-judgment interest rates that applied at the time in all fifty States, as well as the District of Columbia, Puerto Rico, and the United States Virgin Islands. The District of Columbia, Illinois, and Oklahoma

provided for two different post-judgment interest rates: a lower one in cases where the defendant was a certain governmental entity, and a higher one in all other cases. In Florida, a post-judgment interest rate of 8% applied to judgments that circuit courts entered, while a post-judgment interest rate of 6% applied to all other judgments. No jurisdiction, including Maryland, provided for different post-judgment interest rates depending on the cause of action.

Originally, House Bill 1683 stated that CJ (1980) § 11-107 would include only the following language: "Except as provided in § 11-106 of this Article, the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment." Thus, as to CJ (1980) § 11-107, House Bill 1683's original version contained only the language that ultimately became CJ (1980) § 11-107(a), and would have increased the post-judgment interest rate from 6% to 10% for judgments in all cases. In other words, consistent with existing Maryland law under Article 3, Section 57 of the Constitution of Maryland of 1867, as well as the law of every other jurisdiction at the time, there would not be different post-judgment interest rates depending on the cause of action.

House Bill 1683's bill file includes a handwritten list of amendments to House Bill 1683's original version, including the following amendment: "[I]nsert '(B) the legal rate of interest on a ∧ money judgment for rent of residential premises shall be at the rate of 6 percent per annum on the amount of the judgment.'" The word "money" appears above the word "a" and the caret (∧). Thus, it appears that the word "money" was added after the

language that ultimately became CJ (1980) § 11-107(b) was originally drafted.[23]

Nothing in House Bill 1683's bill file expressly explains why the General Assembly enacted CJ (1980) § 11-107(b), and thus retained the existing post-judgment interest rate of 6% for "money judgment[s] for rent of residential premises[.]"

**Causes of Action By Landlord Against Tenant**

Where a residential lease is involved, the causes of action that a landlord may initiate against a tenant under certain circumstances include an action for distress for rent, a tenant holding over action, a summary ejectment action, an action for breach of lease, and an action for breach of contract. As discussed below, although an action for breach of contract between a landlord and a tenant is based on a breach of a lease, the phrase "an action for breach of lease" is a term of art for a particular cause of action that is distinct from an action for breach of contract. See Md. Code Ann., Real Prop. (1974, 2015 Repl. Vol., 2016 Supp.) ("RP") § 8-402.1 (Breach of Lease).[24]

_____

[23]The addition of the word "money" to CJ (1980) § 11-107(b) is not significant here. A "money judgment" is "[a] judgment for damages [that is] subject to immediate execution, as distinguished from equitable or injunctive relief." *Money Judgment*, Black's Law Dictionary (10th ed. 2014). As discussed below, a landlord may seek a money judgment in an action for breach of contract, as well as multiple actions in which the landlord may also seek possession of the premises, such as summary ejectment actions. Accordingly, the addition of the word "money" to CJ (1980) § 11-107(b) does not resolve the issue of whether CJ § 11-107(b) can apply to an action for breach of contract, or whether CJ § 11-107(b) applies only to actions in which the landlord may seek possession of the premises.

[24]We do not address the following causes of action, which either do not involve, or are not specific to, landlords and tenants. An action for waste involves a dispute between a property owner and a person who possesses, and either causes or allows damage to, the property. See RP § 14-102. Actions for possession and wrongful detainer actions involve disputes regarding the right to possess a property. See RP §§ 14-108.1, 14-132. A grantee

Before we discuss these five causes of action in detail, we provide the following table with their important characteristics:

| Cause of Action:[25] | Governed by: | Available when: | Possible Relief: |
|---|---|---|---|
| Action for Distress for Rent | RP §§ 8-301 to 8-332 | Tenant fails to pay rent | • Possession of premises<br>• Levy on, and sale of, goods on premises<br>• Deficiency money judgment |
| Tenant Holding Over Action | RP § 8-402 | Tenant holds over—*i.e.*, stays on premises after lease expires or tenancy terminates | • Possession of premises<br>• Unpaid rent for period when tenant occupied premises<br>• Damages caused by holding over |
| Summary Ejectment Action | RP § 8-401 | Tenant fails to pay rent | • Possession of premises<br>• Unpaid rent for period when tenant occupied premises |
| Action for Breach of Lease | RP § 8-402.1 | Tenant breaches lease in way other than by failing to pay rent | • Possession of premises |
| Action for Breach of Contract | Common Law | Tenant breaches lease | • Unpaid rent for period when tenant occupied premises<br>• Unpaid rent for period after tenant vacated premises<br>• Other damages caused by breach of lease |

In an action for distress for rent, a landlord seeks "[t]he seizure of [a tenant]'s

_____

action involves a dispute between a grantee of a property and a grantor of the property who remains in possession of the property in violation of a written agreement.  See RP § 14-109.

[25]An action under RP §§ 8-301 to 8-332 is known as an action for distress for rent, or an action for distraint.  See Hudson v. Hous. Auth. of Balt. City, 402 Md. 18, 29 & n.7, 935 A.2d 395, 401 & n.7 (2007).  An action under RP § 8-402 is known as a tenant holding over action.  See Lockett v. Blue Ocean Bristol, LLC, 446 Md. 397, 406, 132 A.3d 257, 262 (2016).  An action under RP § 8-401 is known as a summary ejectment action.  See Cane v. EZ Rentals, 450 Md. 597, 602, 149 A.3d 649, 651-52 (2016).  An action under RP § 8-402.1 is known as an action for breach of lease.  See Hudson, 402 Md. at 21, 935 A.2d at 397.

property to secure . . . the payment of overdue rent." *Distress*, Black's Law Dictionary (10th ed. 2014). A landlord may initiate an action for distress for rent "only for unpaid rent under a written lease for a term of more than three months, or under a tenancy at will or a periodic tenancy that has continued more than three months." RP § 8-302(c). In an action for distress for rent, the District Court may order a levy on goods that are on the premises. See RP § 8-305(a). Subsequently, the District Court may order a sale of the goods. See RP § 8-314(b). If, after payment of costs, the proceeds from the sale of the goods are not enough to cover the landlord's claim, then the District Court "may order a money judgment entered for the deficiency against the" tenant. RP § 8-325(a). Under certain circumstances, the District Court may also declare the lease terminated, and award the landlord possession of the premises. See RP § 8-324(c).

In a tenant holding over action, a landlord sues a tenant who has held over—*i.e.*, who has stayed on the premises "beyond the expiration of the lease or termination of the tenancy[.]" RP § 8-402(a)(1). The tenant is "liable to the landlord for the actual damages caused by the holding over." Id. The damages "may not be less than the apportioned rent for the period of holdover at the rate under the lease." RP § 8-402(a)(2). Under certain circumstances, the District Court "shall [] give judgment for the restitution of the possession of [the] premises[.]" RP § 8-402(b)(2)(i). A landlord may initiate a tenant holding over action "separate from [an] eviction or removal proceeding[,] or in the same action[.]" RP § 8-402(a)(3)(i).

One example of such an eviction or removal proceeding is a summary ejectment action. In a summary ejectment action, a landlord seeks possession of the premises where

a tenant "fail[s] to pay the rent when due and payable[.]" RP § 8-401(a). Summary

ejectment actions are called such because they "are expedited." Cane v. EZ Rentals, 450

Md. 597, 602, 149 A.3d 649, 652 (2016). In other words, a summary ejectment action is

"a means by which a landlord might rapidly and inexpensively obtain []possession of [the]

premises[.]" Greenbelt Consumer Servs., Inc. v. Acme Mkts., Inc., 272 Md. 222, 229, 322

A.2d 521, 525 (1974). "[N]o pretrial discovery . . . [is] permitted in . . . an action for

summary ejectment[.]" Md. R. 3-711(2).[26] Ordinarily, a trial in a summary ejectment

action is "held on the fifth day after the filing of the complaint[.]" RP § 8-401(b)(3)(i).

Unless the parties consent to a longer adjournment, the District Court may adjourn the trial

for up to one day if the District Court "is satisfied that the interests of justice will be better

served by an adjournment to enable either party to procure their necessary witnesses[.]"

RP § 8-401(c)(1). Ordinarily, if the District Court enters judgment in the landlord's favor

against the tenant, then the District Court "shall also order that possession of the premises

be given to the landlord . . . within [four] days after the trial." RP § 8-401(c)(3).

In a summary ejectment action, in addition to awarding the landlord possession of

the premises, the District Court may award the landlord damages. See RP § 8-401(c)(2).

RP § 8-401(c)(2) governs damages in a summary ejectment action, in pertinent part, as

follows:

> (ii) If, when the trial occurs, it appears to the satisfaction of the court, that
> the rent, or any part of the rent and late fees are actually due and unpaid, the

---

[26]Maryland Rule 3-711(2) also states that "no pretrial discovery [is] permitted in" grantee actions, wrongful detainer actions, actions for distress for rent, and tenant holding over actions.

court shall determine **the amount of rent and late fees due as of the date the complaint was filed less the amount of any utility bills, fees, or security deposits paid by a tenant** under § 7-309 of the Public Utilities Article,[27] if the trial occurs within the time specified by subsection (b)(3) of this section.

(iii) 1. If the trial does not occur within the time specified in subsection (b)(3)(i) of this section and the tenant has not become current since the filing of the complaint, the court, if the complaint so requests, shall enter a judgment in favor of the landlord for possession of the premises and determine **the rent and late fees due as of the trial date.**

2. The determination of rent and late fees shall include the following:

**A. Rent claimed in the complaint;**

**B. Rent accruing after the date of the filing of the complaint;**

**C. Late fees accruing in or prior to the month in which the complaint was filed; and**

**D. Credit for payments of rent and late fees and other fees, utility bills, or security deposits paid by a tenant** under § 7-309 of the Public Utilities Article after the complaint was filed.

---

[27]Md. Code Ann., Pub. Util. (1998, 2010 Repl. Vol., 2016 Supp.) § 7-309(g) states: "A tenant may deduct from rent due to a landlord the amount of payments made to a utility service provider in accordance with [RP] § 8-212.3[.]" In turn, RP § 8-212.3(b) states:

A tenant may deduct from rent due to a landlord the amount of payments made to a utility service provider for utility service if:

(1) An oral or written lease for an affected dwelling unit requires the landlord to pay the utility bill; and

(2)(i) The tenant pays all or part of the utility bill, including payments made on a new utility service account; or

(ii) The tenant pays any security deposit required to obtain a new utility service account.

(iv) In the case of a residential tenancy, the court may also give judgment in favor of the landlord for **the amount of rent and late fees determined to be due together with costs of the suit** if the court finds that the residential tenant was personally served with a summons.[28]

(Emphasis added).

In a summary ejectment action, if the District Court awards the landlord possession of the premises, the tenant has the right to redemption—that is, the right to "regain[] possession by paying a specific price." *Redemption*, Black's Law Dictionary (10th ed. 2014). RP § 8-401(e) governs the right to redemption as follows:

(1) Subject to paragraph (2) of this subsection, in any action of summary ejectment for failure to pay rent where the landlord is awarded a judgment giving the landlord restitution of the leased premises, the tenant shall have the right to redemption of the leased premises by tendering in cash, certified check or money order to the landlord or the landlord's agent all past due amounts, as determined by the court under subsection (c) of this section, plus all court awarded costs and fees, at any time before actual execution of the eviction order.

(2) This subsection does not apply to any tenant against whom [three] judgments of possession have been entered for rent due and unpaid in the [twelve] months prior to the initiation of the action to which this subsection otherwise would apply.

As noted above, a landlord may initiate a summary ejectment action only where a tenant fails to pay rent. See RP § 8-401(a). Where a tenant breaches a lease in a way other than by failing to pay rent, and "[w]here an unexpired lease for a stated term provides that the landlord may repossess the premises prior to the expiration of the stated term if the tenant breaches the lease," RP § 8-402.1(a)(1)(i), the landlord may initiate an action for

---

[28]We do not address RP § 8-401(v) and (vi), which apply only to nonresidential tenancies, and thus are immaterial to the instant cases.

breach of lease.  See Brown v. Hous. Opportunities Comm'n of Montgomery Cty., 350 Md. 570, 577, 714 A.2d 197, 200 (1998) (RP § 8-402.1 "provides a procedure for recovery of the premises when the tenant has breached a covenant of the lease, other than the covenant to pay rent that is currently due.").  In an action for breach of lease, "[i]f the [District C]ourt determines that the tenant breached the terms of the lease and that the breach was substantial and warrants an eviction, the court shall give judgment for the restitution of the possession of the premises[.]" RP § 8-402.1(b)(1).

Where a tenant breaches a lease—whether by failing to pay rent, or otherwise—a landlord may initiate an action for breach of contract.  See Arthur Treacher's Fish & Chips of Fairfax, Inc. v. Chillum Terrace Ltd. P'ship, 272 Md. 720, 729, 327 A.2d 282, 287 (1974) ("[T]he lease [] was also a contract, the breach of which entitled [the landlord] to damages appropriate to such cases."  (Footnote omitted)).  In an action for breach of contract, a landlord may seek relief that the landlord could not seek in a summary ejectment action.  See Shum v. Gaudreau, 317 Md. 49, 59, 562 A.2d 707, 712 (1989) ("Because the relief available in a summary ejectment action is limited to a judgment for []possession of premises and rent actually due, [the l]andlord could not have joined a claim for general contract damages claim in that proceeding.").

**Examples of Landlord-Tenant Actions**

In Arthur Treacher's, 272 Md. at 722-23, 729, 327 A.2d at 283-84, 287, an action for breach of contract based on a commercial lease, this Court held that a trial court erred in basing damages on unpaid rent where the tenant never possessed the property.  In Arthur Treacher's, id. at 721-23, 327 A.2d at 283-84, a property owner and a restaurant company

entered into a ten-year commercial lease for a vacant restaurant. In the commercial lease, the property owner agreed to renovate the vacant restaurant. See id. at 722, 327 A.2d at 283-84. After the property owner began the renovations, but before the renovations were complete, the restaurant company informed the property owner that it would not take possession of the vacant restaurant. See id. at 724-25, 327 A.2d at 285.

The property owner sued the restaurant company for breach of contract. See id. at 721, 327 A.2d at 283. At a bench trial, a trial court determined that the restaurant company had breached the commercial lease. See id. at 725, 327 A.2d at 285. The trial court entered judgment in the property owner's favor against the restaurant company, in the amount of the rent that the restaurant company would have owed the property owner as of the date of the trial, minus the costs that the property owner would have incurred if the restaurant company had occupied the restaurant for ten years. See id. at 725, 327 A.2d at 285.

On appeal, the restaurant company contended that the trial court had erred in basing the damages on unpaid rent. See id. at 726, 327 A.2d at 285. This Court agreed, stating: "Since a future leasehold interest was created [that] never became possessory, the allowance of unpaid rent was not a proper remedy." Id. at 729, 327 A.2d at 287. This Court observed that "a lease is both a contract and a conveyance of a leasehold estate in land[.]" Id. at 727, 327 A.2d at 286. This Court also noted that rent is an "obligation [that] arises out of the leasehold estate[.]" Id. at 728, 327 A.2d at 286. This Court explained that, accordingly, where a tenant breaches a lease before possessing the premises, the tenant "cannot be held liable for rent, because the leasehold estate has never come into existence as a present possessory interest[.]" Id. at 729, 327 A.2d at 287. This Court concluded that,

- 31 -

where a tenant breaches a lease before possessing the premises, the proper basis of damages is "the excess of the rent [that was] reserved under the lease [] over the reasonable rental value of the premises at the time of the breach[.]" Id. at 730-31, 327 A.2d at 288.

In Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship, 376 Md. 331, 334, 829 A.2d 976, 977 (2003), an action for breach of contract based on a commercial lease, this Court held that a trial court erred in concluding that a tenant was no longer obligated to pay rent after the tenant vacated the building, which was later demolished. In Circuit City, id. at 334-35, 829 A.2d at 977-78, an electronics store company and a property owner entered into a twenty-year commercial lease, in which the electronics store company agreed to pay twenty years' worth of rent, regardless of whether the premises became vacant. The commercial lease also provided that any sublease was subject to the property owner's approval. See id. at 334, 829 A.2d at 978. Under the commercial lease, if the property owner relet the premises, the electronics store company was entitled to a credit for the amount of rent that the new tenant paid the property owner, minus the expenses that the reletting caused. See id. at 335, 829 A.2d at 978.

After approximately ten years, the electronics store company vacated the premises. See id. at 336, 829 A.2d at 978. The electronics store company proposed subletting the premises to a music store company. See id. at 335-36, 829 A.2d at 978. The property owner rejected the proposed sublease. See id. at 336, 829 A.2d at 978. The electronics store company sued the property owner, seeking a declaratory judgment that the property owner had violated the lease by rejecting the proposed sublease. See id. at 336, 829 A.2d at 979. The property owner counterclaimed for breach of contract. See id. at 337, 829

A.2d at 979.

While the litigation was pending, the electronics store stopped paying the full amount of rent that it had agreed to pay in the commercial lease, and instead reduced that amount by the amount that the music store company would have been obligated to pay if the property owner had approved the sublease. See id. at 337-38, 829 A.2d at 979. Meanwhile, the property owner and a grocery store company entered into a twenty-year commercial lease for the premises. See id. at 338, 829 A.2d at 980.

A jury found that the electronics store company had breached the commercial lease's provision regarding continuous operation. See id. at 339, 829 A.2d at 980. The jury also found that the property owner had not breached the commercial lease by rejecting the proposed sublease. See id. at 339, 829 A.2d at 980. A trial court entered judgment in the property owner's favor against the electronics store company. See id. at 340-41, 829 A.2d at 981-82. The electronics store company paid the required amount in full, and resumed paying the full amount of rent that it would have been required to pay under the commercial lease. See id. at 341, 829 A.2d at 982.

Subsequently, the grocery store company had the building on the premises demolished to make way for a new grocery store. See id. at 341, 829 A.2d at 982. The electronics store company filed a motion to modify or vacate the judgment, contending, among other things, that the property owner had surrendered the commercial lease by allowing the building on the premises to be demolished. See id. at 342, 829 A.2d at 982. The trial court agreed, granted the motion, and concluded that the electronics store company was no longer obligated to pay rent after the building on the premises was

demolished.  See id. at 343, 829 A.2d at 982-83.

On appeal, the property owner contended that the trial court lacked the authority to modify or vacate the judgment and that the trial "court erred by applying a principle of landlord-tenant law to strike an enrolled judgment awarding contract damages." Id. at 343, 829 A.2d at 983.  The Court of Special Appeals determined that, "even if the [trial c]ourt had authority to modify the [] judgment, it erred in doing so." Id. at 333, 829 A.2d at 977.  On review, this Court concluded that the judgment was not subject to reopening, "and that the trial court therefore erred in considering, in the context of a motion to vacate or modify that judgment, whether demolition of the [premises] terminated [the electronics store company]'s contractual obligation to pay rent damages." Id. at 344, 829 A.2d at 983.

This Court also held, however, that a remand was necessary to determine the amount that the electronics store company owed the property owner. See id. at 344-45, 829 A.2d at 983-84.  This Court remanded with instructions to determine whether the property owner's arrangement with the grocery store company was reasonable. See id. at 357, 829 A.2d at 991.  This Court explained that, if not, then the property owner breached the commercial lease by failing to mitigate damages, and the electronics store company was no longer obligated to pay rent. See id. at 357, 829 A.2d at 991.  This Court further explained that, if the property owner's arrangement with the grocery store company was reasonable, then the electronics store company was entitled to a credit for the amount that the grocery store company had paid the property owner, minus the expenses that reletting caused. See id. at 357, 829 A.2d at 991.

In Lockett v. Blue Ocean Bristol, LLC, 446 Md. 397, 424-25, 132 A.3d 257, 273

(2016), this Court held that, as used in RP § 8-208.1 (Retaliatory actions), the word "'rent' means the periodic sum owed by the tenant for use or occupancy of the premises." State law protects residential tenants from retaliation by landlords. Under RP § 8-208.1(d), if a tenant proves retaliation, the tenant can recover only if the tenant is "current on the rent." In Lockett, id. at 419, 132 A.3d at 269, the issue was whether a tenant was "current on the rent" under RP § 8-208.1(d), which states in pertinent part: "The relief provided under this section is conditioned on the tenant being current on the rent due and owing to the landlord at the time of the alleged retaliatory action[.]"

In Lockett, id. at 409, 132 A.3d at 263, a landlord and a tenant entered into a lease that defined "rent" as follows: "All payments from [the tenant] to [the landlord] required under the terms of this lease, including, but not limited to, [c]ourt costs, shall be deemed rent." (Second alteration in original). The lease also stated that the tenant would reimburse the landlord for the tenant's share of the building's utility bill, and defined the reimbursement as "additional rent." Id. at 409, 132 A.3d at 264. A couple of years after entering into the lease, the tenant became the liaison for a tenant association that the building's residents had formed to address certain concerns. See id. at 408-09, 132 A.3d at 263-64. After a contentious meeting with the tenant association, the landlord notified the tenant that the lease would not be renewed, and that she was to vacate the premises by a certain date. See id. at 410, 132 A.3d at 264. When she received the notice, the tenant was current on her rent. See id. at 410, 132 A.3d at 264.

The tenant stayed on the premises and stopped paying rent. See id. at 410, 132 A.3d at 264. The landlord initiated a summary ejectment action, and the tenant initiated a rent

escrow action. See id. at 410, 132 A.3d at 264. The District Court consolidated the actions and entered judgment in the landlord's favor against the tenant. See id. at 411, 132 A.3d at 264-65. Sufficient funds to cover the unpaid rent, however, were paid into the rent escrow account; accordingly, the landlord did not evict the tenant. See id. at 411, 132 A.3d at 264-65.

Subsequently, the landlord initiated a tenant holding over action against the tenant. See id. at 411, 132 A.3d at 265. As a defense and a counterclaim, the tenant alleged that the landlord had violated RP § 8-208.1 by retaliating against her for her participation in the tenant association. See id. at 411, 132 A.3d at 265. The District Court entered judgment in the landlord's favor against the tenant, and declined to consider the tenant's counterclaim on the basis that the tenant had failed to pay the required filing fee. See id. at 412, 132 A.3d at 265.

At a *de novo* trial, a circuit court entered judgment in the tenant's favor against the landlord, concluding that the landlord had violated RP § 8-208.1 by not renewing the lease. See id. at 412-13, 132 A.3d at 265-66. The circuit court also concluded, however, that the landlord had not violated RP § 8-208.1 by initiating the tenant holding over action, as the tenant was not "current on the rent" under RP § 8-208.1(d) when the landlord initiated the tenant holding over action. See id. at 413, 132 A.3d at 266. According to a ledger, at that time, the tenant owed the landlord a balance that was "apparently attributable to . . . a filing fee, late fees, and gas charges." Id. at 413, 132 A.3d at 266. It was undisputed that, at that time, the tenant had paid all of the monthly rent that had been due; the issue was whether the other charges constituted "rent" for purposes of RP § 8-208.1(d). See id. at 415, 132

A.3d at 267.

As a threshold matter, this Court rejected the landlord's contention that a court should defer to a lease's definition of "rent." See id. at 418-19, 421, 132 A.3d at 269, 271. This Court explained:

> Given that residential leases are normally drafted by the landlord and not the subject of extensive negotiation, deferring to the lease's definition of "rent" would incentivize landlords to characterize all possible debts from the tenant to the landlord as "rent" so as to make it less likely that a tenant could obtain any relief under RP § 8-208.1. . . .

Id. at 420, 132 A.3d at 270.

This Court observed that no statute in Title 8 (Landlord and Tenant) of the Real Property Article defines the word "rent." See id. at 418, 132 A.3d at 269. This Court explored the ordinary meaning of the word "rent" as follows:

> "Rent" ordinarily means the periodic sum paid for the use or occupancy of property. This is the typical dictionary definition. *See, e.g.*, Merriam-Webster's Collegiate Dictionary (11th ed.), *available at* http://www.merriam-webster.com/dictionary/rent (https://perma.cc/A42T-ULW7) (defining "rent" as "a usually fixed periodical return made by a tenant or occupant of property to the owner for the possession and use thereof"). It also matches the general legal definition. *See* Black's Law Dictionary (10th ed.2014) (defining "rent" as "[c]onsideration paid, usu[ally] periodically, for the use or occupancy of property (esp[ecially] real property).").

Lockett, 446 Md. at 421, 132 A.3d at 271 (alterations in original).

This Court noted that, in addition to appearing in RP § 8-208.1(d), the word "rent" appeared in RP § 8-208.1(c), which refers to "damages not to exceed the equivalent of [three] months' rent[.]" Id. at 422, 132 A.3d at 271. This Court explained that RP § 8-208.1(c) "suggests that 'rent' is an ascertainable amount that is readily trebled." Id. at 422,

132 A.3d at 271 (footnote omitted). This Court determined that the other references to the word "rent" in Subtitle 2 (Residential Leases) of Title 8 of the Real Property Article "require similar clarity and definiteness." Id. at 422, 132 A.3d at 272 (citations omitted). This Court explained:

> If "rent" means a periodic sum, then it is likely to be easily ascertainable. If "rent" includes additional charges that vary by month and circumstance, then it is not. We think it unlikely that the General Assembly intended such indeterminacy, so statutory context suggests that "rent" in RP § 8-208.1 means "a periodic amount paid for occupancy."

Id. at 423, 132 A.3d at 272. This Court observed that "[o]ther provisions of Title 8 use the term 'rent' in a way that appears to exclude the variable charges at issue in" Lockett. Id. at 423, 132 A.3d at 272.

This Court noted that a court must liberally construe a remedial statute, and narrowly construe an exemption from a remedial statute. See id. at 424, 132 A.3d at 272. This Court explained that RP § 8-208.1 is a remedial statute because it was "designed to protect tenants in residential properties against retaliation by landlords" by "provid[ing] remedies for a tenant when a landlord retaliates in certain ways against the tenant for a variety of reasons." Id. at 424, 132 A.3d at 272. This Court concluded that, accordingly, "RP § 8-208.1(d), which is an exemption from a remedial statute—exempting a landlord who has violated RP § 8-208.1 from being required to provide relief to a tenant if the tenant is not current on the rent—is to be construed narrowly." Id. at 424, 132 A.3d at 273.

Ultimately, this Court concluded that, as used in RP § 8-208.1, the word "rent" means "the periodic charge for use or occupancy of the premises, but not the various other payments that the tenant may owe to the landlord from time to time, even if the lease

characterizes them as 'deemed rent' or 'additional rent.'" Id. at 425, 132 A.3d at 273.

Applying its holding to the case's facts, this Court determined that, on the date on which

the landlord initiated the tenant holding over action, the tenant was "current on the rent"

under RP § 8-208.1(d) because she "was current in paying the fixed monthly amount [that

was] designated in the lease[.]" Id. at 425, 132 A.3d at 273. This Court explained that "the

gas charges, late fees, and court filing fee that [the tenant] allegedly owed to [the landlord]

on th[at] date . . . [we]re not relevant to the question whether she was 'current on the rent.'"

Id. at 425, 132 A.3d at 273.

### Analysis

Here, we conclude that, where a landlord sues a tenant for breach of contract based

on a residential lease, and the trial court enters judgment in the landlord's favor against the

tenant and the judgment includes amounts for unpaid rent and other expenses, a post-

judgment interest rate of 6% applies to the judgment pursuant to CJ § 11-107(b).

We begin by examining the language of CJ § 11-107, which states, in pertinent part:

(a) Except as provided in § 11-106 of this subtitle, the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment.

(b) The legal rate of interest on **a money judgment for rent of residential premises** shall be at the rate of 6 percent per annum on the amount of the judgment.

(Emphasis added). CJ § 11-107(b)'s plain language dictates that it applies where, as here,

a judgment is comprised of unpaid rent and other expenses that are due under a residential

lease. CJ § 11-107(b) unequivocally states that it applies to "a money judgment for rent of

residential premises[.]" Nothing in CJ § 11-107(b) limits its applicability to money

- 39 -

judgments that are entirely comprised solely of unpaid rent—as opposed to being comprised partially of unpaid rent, and partially of other expenses, such as late fees or the costs of repairs to the residence, which may be due as the result of renting residential premises. Stated otherwise, CJ § 11-107(b) does not contain language that "a money judgment for rent of residential premises" is strictly, or only, for unpaid rent. We decline to add words to CJ § 11-107(b) to render it applicable only to money judgments that are comprised solely of unpaid rent. See Bottini, 450 Md. at 188, 147 A.3d at 378 ("[W]e neither add nor delete words to a clear and unambiguous statute[.]" (Citation omitted)).

In contending that, as used in CJ § 11-107(b), the word "rent" refers only to money that a tenant owes a landlord for a period when the tenant occupied the premises, Appellee mistakenly focuses on the word "rent" in isolation. We agree, however, with the position of Civil Justice, Inc., the Maryland Volunteer Lawyers Service, and the Public Justice Center, *amici*, that the phrase "a money judgment for rent of residential premises" indicates that CJ § 11-107(b) applies to money judgments that are related to rentals of residential premises. In the context of the phrase "a money judgment **for rent of residential premises**[,]" the word "rent" does not refer to a monetary sum, but instead unambiguously refers to the act of renting residential premises. By way of analogy, when a sign says "apartment for rent," the word "rent" does not indicate the monetary sum that a tenant would owe each month; instead, the word "rent" indicates that the landlord is renting the apartment. In short, as used in CJ § 11-107(b), the word "rent" is synonymous with the act of renting and not the monetary sum that a tenant owes each month.

Similarly, CJ § 11-107(b)'s plain language belies Appellee's contention that CJ §

11-107(b) does not apply to actions for breach of contract, and instead applies only to actions in which a landlord seeks possession of the premises. At the risk of stating the obvious, if the General Assembly had intended for CJ § 11-107(b) to apply only to actions in which a landlord seeks possession of the premises—namely, actions for distress for rent, summary ejectment actions, tenant holding over actions, and actions for breach of lease— the General Assembly easily could have stated as much. In 1974—six years before the General Assembly enacted CJ (1980) § 11-107(b)—the General Assembly enacted, within Title 8 (Landlord and Tenant) of the Real Property Article, the statutes that govern actions for distress for rent (now RP §§ 8-301 to 8-332), summary ejectment actions (now RP § 8-401), and tenant holding over actions (now RP § 8-402). See 1974 Md. Laws 329-49 (Ch. 12, S.B. 200). Four years later, in 1978—two years before the General Assembly enacted CJ (1980) § 11-107(b)—the General Assembly enacted the statute that governs actions for breach of lease (now RP § 8-402.1). See 1978 Md. Laws 1643 (Ch. 478, S.B. 570). Had the General Assembly intended for CJ (1980) § 11-107(b) to apply only to actions in which landlords seek possession of the premises, and not to actions for breach of contract, the General Assembly could have specified that CJ (1980) § 11-107(b) applied only to the legal rate of interest on a money judgment in an action pursuant to §§ 8-301 to 8-332, 8-401, 8-402, or 8-402.1 of the Real Property Article. Alternatively, the General Assembly could have specified that CJ (1980) § 11-107(b) applied only in an action for distress for rent, a summary ejectment action, a tenant holding over action, or an action for breach of lease. The General Assembly did not do so.

By way of contrast, CJ § 4-401(4), which governs the District Court's jurisdiction,

provides in pertinent part, as follows: "[T]he District Court has exclusive original civil jurisdiction in . . . [a]n action involving landlord and tenant, distraint, or wrongful detainer, regardless of the amount involved[.]" In Greenbelt Consumer, 272 Md. at 230, 322 A.2d at 526, this Court held that, under CJ § 4-401(4), the District Court has exclusive original civil jurisdiction in actions for distress for rent (also known as actions for distraint), summary ejectment actions, and tenant holding over actions, regardless of the amount in controversy.[29] This Court concluded that CJ § 4-401(4) does not extend the District Court's jurisdiction to actions for breach of contract between landlords and tenants where the amount in controversy exceeds the District Court's statutory maximum. See Greenbelt Consumer, 272 Md. at 230, 322 A.2d at 526.

Just as the General Assembly drafted CJ § 4-401(4) to apply only to certain causes of action—such as "action[s] involving . . . distraint[] or wrongful detainer"—the General Assembly could have drafted CJ (1980) § 11-107(b) to apply only to actions for distress for rent, summary ejectment actions, tenant holding over actions, and/or actions for breach of lease. The General Assembly, however, did not limit CJ (1980) § 11-107(b)'s applicability to specific causes of action. Instead, the General Assembly made CJ (1980) § 11-107(b) applicable to "money judgment[s] for rent of residential premises[.]" Simply

---

[29]This Court decided Greenbelt, 272 Md. 222, 322 A.2d 521, in 1974—four years before the General Assembly enacted what is now RP § 8-402.1 (Breach of Lease) in 1978. See 1978 Md. Laws 1643 (Ch. 478, S.B. 570). In Kirk v. Hilltop Apartments, LP, 225 Md. App. 34, 35 n.1, 123 A.3d 554, 555 n.1 (2015), the Court of Special Appeals stated that, although, under CJ § 4-401(4), the District Court has exclusive original civil jurisdiction over an action for breach of lease, where the amount in controversy exceeds the District Court's statutory maximum, "a party to the proceeding may invoke the right to a jury trial in the circuit court by filing a timely demand for the same." (Citations omitted).

put, nothing in CJ § 11-107(b)'s plain language renders it inapplicable to actions for breach of contract between landlords and tenants.

Although, as explained above, CJ § 11-107(b)'s plain language is unambiguous with respect to its applicability to "money judgment[s] for rent of residential premises[,]" we review its legislative history as "a confirmatory process[.]" Lamone v. Schlakman, 451 Md. 468, 496, 153 A.3d 144, 161 (2017) (citations omitted). Before the General Assembly enacted CJ (1980) § 11-107, the post-judgment interest rate for all judgments was 6%. See Md. Const., Art. III, § 57 ("The legal rate of interest shall be *six per cent per annum*, unless otherwise provided by the General Assembly." (Italics in original)). By enacting CJ (1980) § 11-107, the General Assembly raised the default post-judgment interest rate to 10%, see CJ (1980) § 11-107(a), but retained the existing post-judgment interest rate of 6% for "money judgment[s] for rent of residential premises[.]" CJ (1980) § 11-107(b). Nothing in the bill file of House Bill 1683—through which the General Assembly enacted CJ (1980) § 11-107—expressly explains why the General Assembly did not raise the post-judgment interest rate for money judgments for rent of residential premises.

That said, CJ (1980) § 11-107(b)'s obvious purpose was to protect tenants by not subjecting them to an increased post-judgment interest rate on money judgments for rent of residential premises. In other words, it is evident that the General Assembly carved out an exception to the default post-judgment interest rate of 10% for the benefit of residential tenants. Needless to say, the new default post-judgment interest rate of 10% would have been more burdensome on residential tenants than the existing post-judgment interest rate of 6%. It is entirely logical for the General Assembly to have imposed a lower post-

judgment interest rate on residential tenants, given that, if the District Court enters a money judgment for rent of residential premises, a tenant is likely to already be experiencing financial difficulties, which a higher post-judgment interest rate would only exacerbate. CJ (1980) § 11-107(b)'s obvious purpose of protecting residential tenants supports the conclusion that CJ § 11-107(b) applies where a money judgment is comprised of unpaid rent and other expenses that are due under a residential lease.

Indeed, we can fathom no rational explanation as to why, as Appellee posits, the General Assembly would have intended for CJ § 11-107(b) to apply to actions in which a landlord seeks possession of the premises, but not actions for breach of contract between landlords and tenants. At a minimum, it would be inconsistent to subject residential tenants to a post-judgment interest rate of 10% in breach of contract actions between landlords and tenants for rent of residential premises, but protect residential tenants from the post-judgment interest rate of 10% in other actions between landlords and tenants.

Our holding in this case is fully consistent with our recent holding in Lockett, 446 Md. at 415, 132 A.3d at 267, in which this Court defined the word "rent" as used in RP § 8-208.1 (Retaliatory actions). Specifically, in Lockett, id. at 415, 132 A.3d at 267, this Court examined the meaning of the word "rent" as used in RP § 8-208.1(d), which states, in pertinent part: "The relief provided under this section is conditioned on the tenant being current on the rent due and owing to the landlord at the time of the alleged retaliatory action[.]" This Court defined the word "rent," as used in RP § 8-208.1(d), as "the periodic sum owed by the tenant for use or occupancy of the premises." Id. at 424-25, 132 A.3d at 273. This Court explained that RP § 8-208.1(d) is "to be construed narrowly" because RP

§ 8-208.1(d) is an exemption from RP § 8-208.1, which is a remedial statute. Id. at 424, 132 A.3d at 273. This Court observed that RP § 8-208.1's remedial purpose is "to protect tenants in residential properties against retaliation by landlords." Id. at 424, 132 A.3d at 272.

Appellee misapplies Lockett by asserting that, because of this Court's analysis in Lockett, it is clear that the definition of "rent" applies solely to money judgments entered in summary ejectment actions pursuant to RP § 8-401. In Lockett, this Court's definition of the word rent in RP § 8-208.1(d) does not lead to the conclusion that the term rent as used in CJ § 11-107(b) applies only to money judgments in summary ejectment cases. Lockett did not involve a summary ejectment action; rather, Lockett concerned a tenant holding over action that involved a counterclaim for retaliation by a landlord against a tenant. See id. at 411, 132 A.3d at 265. And, in Lockett, id. at 415, 132 A.3d at 267, the issue before this Court was not the definition of the word "rent" in RP § 8-401, which governs summary ejectment actions; instead, the issue was the definition of the word "rent" in RP § 8-208.1, which prohibits landlords from taking retaliatory actions against tenants under certain circumstances. In Lockett, 446 Md. at 425, 132 A.3d at 273, this Court determined that a tenant was "current on the rent" under RP § 8-208.1(d) because she had paid "the fixed monthly amount [that was] designated in the lease[,]" even though she had not paid gas bills, late fees, and a court filing fee. In defining the word "rent," this Court narrowly construed RP § 8-208.1(d), which precludes relief for retaliation by a landlord against a tenant where the tenant is not "current on the rent[,]" in a manner that permitted the tenant an opportunity for relief. See id. at 424, 132 A.3d at 273.

To be sure, in <u>Lockett</u>, <u>id.</u> at 422-23, 132 A.3d at 272, in defining the word "rent," as used in RP § 8-208.1(d), this Court examined other statutes within Title 8 (Landlord and Tenant) of the Real Property Article that include the word "rent." For example, this Court observed that, under RP § 8-401(c)(2)(iv), "a landlord may recover, for nonpayment of rent for a residential tenancy, both 'late fees' and 'costs of the suit[,]' indicating that [RP § 8-401] treats 'rent' as distinct from late fees." <u>Id.</u> at 423, 132 A.3d at 272. Significantly, however, this Court did not purport to define the word "rent" as it is used in the phrase "money judgment for rent of residential premises" in CJ § 11-107(b), or in any way indicate that the term "rent" applies solely to money judgments entered pursuant to RP § 8-401. Put simply, although <u>Lockett</u> may be relevant to the interpretation of the word "rent" as used in a statute within Title 8 of the Real Property Article, <u>Lockett</u> does not address the issue of whether judgments like those in the instant cases constitute "money judgment[s] for rent of residential premises" under CJ § 11-107(b).

Nor does <u>Lockett</u> provide any support for Appellee's proposition that CJ § 11-107(b) does not apply to a judgment that is comprised partially of rent, and partially of other expenses. In <u>Lockett</u>, 446 Md. at 423, 132 A.3d at 272, this Court concluded that, it was "unlikely that the General Assembly intended" for the word "rent," as used in RP § 8-208.1(d), to "include[] additional charges that vary by month and circumstance," and thus are not "easily ascertainable." The principle that this Court discussed in <u>Lockett</u> as to RP § 8-208.1(d)—namely, that it is unlikely that the General Assembly intended the word "rent" as used RP § 8-208.1(d) to include other charges that may vary from month to month and that are not easily ascertainable—does not apply to the instant cases. As discussed

- 46 -

above, by its plain language, CJ § 11-107(b) applies to a money judgment for rent of residential premises—*i.e.*, the act of renting residential premises. In other words, the analysis of the meaning of the word "rent" in CJ § 11-107(b) includes consideration of the meaning of the entire phrase "money judgment for rent of residential premises" and is not limited to ascertaining the definition of the word "rent" in isolation, or dependent upon the definition of the word "rent" in RP § 8-208.1.

Because the phrase "money judgment for rent of residential premises" encompasses the act of renting residential premises, it is not required that, in issuing judgments for rent of residential premises, the District Court delineate the portion of the judgment that is comprised of unpaid rent as opposed to other expenses for a post-judgment interest rate of 6% to apply pursuant to CJ § 11-107(b). As discussed above, CJ § 11-107(b)'s plain language contains no limitation of its applicability to money judgments that are comprised of unpaid rent and other expenses. Where a judgment is comprised of unpaid rent and other expenses, a post-judgment interest rate of 6% pursuant to CJ § 11-107(b) applies to the entirety of the judgment.[30]

We are unpersuaded by Appellee's reliance on Arthur Treacher's, 272 Md. at 729, 327 A.2d at 287, and Circuit City, 376 Md. at 354, 829 A.2d at 989, for the proposition that, as used in CJ § 11-107(b), the word "rent" refers only to money that a tenant owes a

---

[30]Because CJ § 11-107(b) applies to the entirety of a judgment, it makes no difference that the District Court's form for Judgment Creditor's Monthly Reports includes only one blank for the applicable post-judgment interest rate, as follows: "Interest accrued at ___ % on $ _____ (the outstanding principal due on the judgment)[.]" In other words, because only one post-judgment interest rate applies, there is no need for multiple blanks for multiple post-judgment interest rates.

landlord for a period when the tenant occupies the premises. Arthur Treacher's and Circuit City provide no guidance here. Both Arthur Treacher's, 272 Md. at 723, 327 A.2d at 284, and Circuit City, 376 Md. at 353, 829 A.2d at 988, involved commercial leases. As such, Arthur Treacher's and Circuit City are of limited utility in interpreting CJ § 11-107(b), which applies only to "money judgment[s] for rent of **residential** premises[.]" (Emphasis added). Additionally, Arthur Treacher's and Circuit City did not involve statutory interpretation, or a determination of the definition of the word "rent." In Arthur Treacher's, 272 Md. at 730-31, 327 A.2d at 288, the issue involved the correct measure of damages in a breach of contract action based on a commercial lease where the tenant did not take possession of the premises. In Circuit City, 376 Md. at 357, 829 A.2d at 991, the issue involved the amount that a tenant owed a landlord under a commercial lease after the landlord relet the property. In addition to being distinguishable on the grounds mentioned, this Court's holding in Circuit City, id. at 357, 829 A.2d at 991, does not support the proposition that a commercial tenant, let alone a residential tenant, is liable for rent only when the tenant occupies the premises. Circuit City, id. at 334, 344, 829 A.2d at 977, 983, involved a breach of contract action for the period after the tenant vacated the premises, and this Court remanded to determine the tenant's obligation to pay rent under the lease. In neither Arthur Treacher's nor Circuit City did this Court define the word "rent," let alone do so in the context of interpreting CJ § 11-107(b). The holdings in Arthur Treacher's and Circuit City do not alter our conclusion that CJ § 11-107(b) applies where a judgment is comprised of unpaid rent and other expenses that are due for rent of residential premises.

Having held that a post-judgment interest rate of 6% pursuant to CJ § 11-107(b)

applies to judgments that are comprised of unpaid rent and other expenses that are due under residential leases, we apply our holding to the instant cases. In both of the actions for breach of contract that are at issue here, the correct post-judgment interest rate was 6% because the money judgments were for rent of residential premises. In both Ben-Davies and Moore, the judgments consisted of unpaid rent and expenses that were associated with the rent of residential premises. In Ben-Davies, the $2,728.09 judgment was comprised of: at least $1,719.38 in unpaid rent, $893.62 for an overdue balance,[31] and $115.09 for replacing carpet in the apartment. In Moore, the $3,606.47 judgment represented $4,664.90, minus $150.00 in payments and $908.43 for the security deposit, plus interest. The $4,664.90 in charges were comprised of: $1,789.00 for unpaid rent in months when Moore and Pompey occupied the apartment; $1,790.00 for unpaid rent in months after Moore and Pompey vacated the apartment—*i.e.*, a total of $3,579.00 in unpaid rent—and $1,085.90 for other expenses, such as late fees, utilities, and cleaning stained carpet.

In sum, based on the plain language of CJ § 11-107(b), because the money judgments were comprised of amounts that were due to the rent of residential premises, a post-judgment interest rate of 6% pursuant to CJ § 11-107(b) applied to the entirety of the

---

[31]In Ben-Davies, although $893.62 of the judgment is attributable to an overdue balance as of October 9, 2006, the source of the overdue balance is not specifically identified. Appellee has not contended that this source is not related to the rental of the residential premises at issue. Additionally, because the record does not reveal the date on which Ben-Davies vacated the apartment, it cannot be determined how much, if any, of the unpaid rent was for a period when Ben-Davies occupied the apartment, and how much, if any, of the unpaid rent was for a period after Ben-Davies vacated the apartment. In any event, such a determination is unnecessary here.

judgments.  The awards of court costs and attorney's fees, however, did not constitute part of the judgments, and thus were not subject to post-judgment interest. [32]

In conclusion, we answer the certified question of law as follows: where a landlord sues a tenant for breach of contract based on a residential lease, and the trial court enters judgment in the landlord's favor against the tenant and the judgment includes unpaid rent and other expenses, a post-judgment interest rate of 6% applies pursuant to CJ § 11-107(b).

**CERTIFIED QUESTION OF LAW ANSWERED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

---

[32]Although CJ § 11-107 does not expressly allow or prohibit interest on court costs and attorney's fees, CJ § 11-107 expressly provides only for interest on a "judgment" itself.